441 P.2d 751

**James B. BROWN and George Mossman, Partners, d/b/a Albuquerque Data Processing, Plaintiff-Appellee,**

**v.**

**AMERICAN BANK OF COMMERCE, Defendant-Appellant.**

**No. 8445.**

Supreme Court of New Mexico.

June 10, 1968.

Albert T. Ussery, Juan G. Burciaga, Albuquerque, for appellant.

Marron & Houk, Dan A. McKinnon III, Ralph M. Marron, Albuquerque, for appellee.

## OPINION

CHAVEZ, Chief Justice.

Appellant American Bank of Commerce, hereinafter referred to as "Bank," appeals from a judgment in favor of plaintiffs-appellees, James B. Brown and George Mossman, partners, d/b/a Albuquerque Data Processing, hereinafter referred to as "ADP."

The complaint alleged that the Bank was obligated, under the terms of an agreement dated February 28, 1963, to have certain work performed by ADP; that the Bank failed to use the services of ADP as was required; and that, as a result thereof, ADP was damaged in the amount of $4,714.32. The Bank answered, denying

the allegations of the complaint. The cause was tried to the court on the parties' stipulation and the trial court granted judgment to ADP in the sum of $4,714.32.

The parties entered into an agreement dated February 28, 1963, and a supplement thereto dated March 1, 1963. The pertinent provisions of the February 28, 1963, contract provide:

"WHEREAS, Bank desires to have ADP prepare and deliver completed report of demand deposits, savings deposits, General Ledger and installment loans of depositors of the Bank, customers or other persons in some way connected with Bank and to furnish Bank such information as shall be requested by Bank from time to time, and

"WHEREAS, ADP has all proper and adequate facilities to accurately, without error or omission, produce reports of demand deposits, savings deposits, General Ledger and installment loans of depositors of Bank and information as shall be requested by Bank as to customers or other persons in some way connected with Bank.

"NOW THEREFORE, in consideration of the mutual covenants hereinafter contained and the sums to be paid by Bank to ADP, it is agreed as follows:

"1. Bank shall key punch all daily activity including all items received in connection with its demand deposits, savings deposits, General Ledger and installment loans and will produce one key punch card for each item received by Bank. Key Punch cards shall be ready and available for pick up by ADP each day. The key punch of said cards shall be at the sole expense of Bank.

"2. ADP shall call for and pick up said key punched, activities cards in batches with proof tape attached for each batch, daily, except Saturday and Sunday, at 11:00 o'clock a. m., Mountain Standard Time and return said batches with proof tape attached together with completed reports of demand deposits, savings deposits, General Ledger and installment loans of depositors of Bank and such other information as to customers of Bank or other persons in some way connected with Bank as shall be, from time to time, requested by Bank, in writing at 1:00 o'clock p. m. Mountain Standard Time, each day except Saturday and Sunday. * * *

" *   *   *   *   *   *

"3. At the close of each month or at such other time during the month as Bank shall request, ADP shall prepare the monthly statements for all depositors in the form specified by Bank and such other reports covering savings accounts, installment loans, and such other reports as Bank shall request in writing. General ledger items will be summarized in the manner accepted by members of the Certified Public Accountant profession in the vicinity of Albuquerque, New Mexico as to prior month's balances, activity and new balances.

" *   *   *   *   *   *

"6. Bank shall pay to ADP for the performance of the foregoing work, 2½¢ per item for each item completed by ADP each month, to and including the 20,999th item and for all items in excess of said number Bank shall pay to ADP the sum of 1½¢ per item. Said sum shall be paid monthly on or before the 10th of the month following the date of completion and delivery of the items to Bank. The number of items each month shall be computed from 8:30 o'clock a. m. Mountain Standard Time on the first day of each month until the same time and date on each subsequent month of each year. Bank shall pay to ADP a minimum sum of $375.00 each month for the service performed.

" *   *   *   *   *   *

"7. ADP shall provide a means for adequately, properly and without error or omission, providing Bank the service hereinabove provided for at such time as ADP shall be unable to do so with its own equipment and shall avoid failure

224

to complete the service as herein required. ADP shall be liable for all damages of any nature whatsoever reasonably suffered or incurred by Bank, directly or indirectly as a result of the failure of ADP to provide the service herein provided for. In establishing damages, it is not necessary for Bank to have judgment taken against it or that suit be filed in any court and Bank may compromise claims for damages which may be made against it. ADP shall be liable to, indemnify, and hold Bank harmless on account of such compromised claims. * *

"* * * * * *

"11. This Agreement shall terminate at midnight on the 180th day following the date that notice in writing shall be deposited in the United States Mails at Albuquerque, New Mexico by one of the parties, directed to the other party at the address and in the manner hereinafter stated."

The trial court found as fact the matters stipulated by the parties as follows: That the agreement was in effect and being performed by ADP when the Bank commenced business, and during the period in which items in sufficient amount to pay ADP a compensation of $375 monthly, or more, were not being generated by the business of the Bank, it paid to ADP monthly $375; that on December 2, 1965, the Bank wrote and delivered to ADP a letter stating that the contract between the parties would be terminated effective May 31, 1966, and that after March 31, 1966, the Bank would process all items on its own equipment and pay ADP only the sum provided for in paragraph 6 of the agreement, which was $375 monthly; that, in response to said letter, ADP advised the Bank by letter dated December 21, 1965, that cancellation of the agreement was accommodated by its terms, but reduction of the amount payable after March 31, 1966, was not accommodated by the agreement and that, therefore, ADP would expect payment on a per item basis, as provided for in the agreement, to the

date of effective termination; that from the period March 11 to May 31, 1966, the Bank processed 393,002 items; and that had these items been processed by ADP it would have resulted in net receipts to ADP in the sum of $4,714.32. The court also found, in accordance with the stipulation, that the Bank installed its own electronic data processing system which was different from the system under which ADP was operating; that the system used by ADP was grounded upon key punch cards; that under the system initiated by the Bank, it no longer had use or used key punch cards, but rather was grounded upon the use of tapes; that in the judgment of the Bank, the system initiated by the Bank was more efficient and less costly than the system used by ADP; and that the reports which the Bank system offered were of greater benefit to the Bank.

The trial court concluded that the agreement contained a provision that the "Bank shall pay to ADP a minimum sum of $375.00 each month for the service performed," and required payment to ADP of the stated amount monthly during the period in which the volume of items developed in the Bank's business for process by ADP was insufficient to yield the minimum sum at a stated price of $2\frac{1}{2}\cent$ per item for a certain minimum number of items and $1\frac{1}{2}\cent$ per item for all in excess of the stated minimum. The trial court also concluded that the agreement provided under paragraph 11 for termination of the contract at midnight on the 180th day following the date on which notice in writing from either of the parties to the other terminating the agreement, but contemplated performance by both parties during the 180-day period following the written notice and was not to be construed as authorization for the Bank to terminate the agreement and its obligation thereunder prior to the expiration of the 180-day period.

The question presented is whether or not the Bank breached its agreement with ADP. The trial court concluded that the Bank did breach the agreement and the Bank claims

that in so concluding the trial court committed error.

The Bank contends that, under the terms of the agreement, it was required to maintain key punch equipment and key punch its activity on cards for delivery to ADP for processing and subsequent rendering of reports to the Bank; that a reduction in the need for ADP's services occurred; that the Bank installed its own electronic data processing system, which was grounded upon the use of magnetic tapes rather than upon key punched cards; and that the system employed by the Bank was more efficient and less costly than the system of ADP, by virtue of which facts it argues that it is excused from using the ADP services.

The Bank cites Southwest Natural Gas Co. v. Oklahoma Portland Cement Co., 102 F.2d 630 (10th Cir.1939); In re United Cigar Stores Co. of America, 72 F.2d 673 (2d Cir.1934); Langenberg v. Guy, 77 Cal. App. 664, 247 P. 621 (1926); Helena Light & Ry. Co. v. Northern Pac. Ry. Co., 57 Mont. 93, 186 P. 702 (1920); Cannonsburg Iron Co. Ltd. v. McKeever, 138 Pa. 184, 16 A. 97 (1888), as supporting its position. We cannot agree. None of those cases involved a contract containing a provision for termination such as that before us.

A close reading of the above-cited cases clearly shows that the contracts considered in those cases are not similar to the contract involved in the instant case. In Southwest Natural Gas Co. v. Oklahoma Portland Cement Co., supra, the contract required buyer to supply for a term of fifteen years all "natural gas as may be needed or required" for fuel, etc. The court held that a requirement contract imposes upon the buyer the obligation to act in good faith and it did not prevent him from improving his plant so long as his conduct was bona fide. The term of the contract was fifteen years and the court said it was a reasonable assumption the parties contemplated that, whenever it became necessary to renew worn out equipment, the cement company would install modern equipment in

its place. The cement company replaced the worn out boilers and consequently used less gas. The court said:

" * * * In the improved plant a new or different fuel was not substituted for gas, but a more efficient and economical utilization of gas was effected so that the heat resulting from the combustion of the gas in the kilns was used both to heat the product in the kilns, and the boilers. Gas was employed to heat the boilers, although part of the heat was the result of direct fire and part was carried from the kilns to the boilers and applied indirectly. In so improving its plant, the Cement Company acted in good faith and in the exercise of prudent business judgment. This it had the right to do.

"We conclude that the installation of the new boiler plant and the using of the waste heat in the kilns to heat the boilers did not constitute a violation of the contract."

The contract in Southwest Natural Gas Co. v. Oklahoma Portland Cement Co., supra, contains different provisions from the case before us. Also, none of the cases cited by the Bank contain provisions for the termination of the contract. The rule enunciated in cases cited by the Bank is correct under the terms of the contracts involved therein.

As a case more directly in point, the Bank cites Kuhn v. Commonwealth, 291 Pa. 497, 140 A. 527 (1928). In that case the contract provided that plaintiff was to do all printing, binding and other work generally executed in a printing and binding establishment for the state for four years and no mention was made of any special items. The question was whether plaintiff had the right to print the hunters' license tags for 1924. The court held that plaintiff could not recover damages for the state's failure to have license tags printed as was done in preceding years, where the state had tags stamped and enameled on aluminum plates instead, since this manner of preparing tags was not printing within

the terms of plaintiff's contract. The contract involved in Kuhn differs materially from the contract in the instant case.

■ The parties are in agreement that where the terms of the contract are clear, the intent must be ascertained from the language used. Boylin v. United Western Minerals Company, 72 N.M. 242, 382 P.2d 717 (1963); Davis v. Merrick, 66 N.M. 226, 345 P.2d 1042 (1959); Ashley v. Fearn, 64 N.M. 51, 323 P.2d 1093 (1958). Also, a contract should be interpreted as a harmonious whole to effectuate the intentions of the parties, and every word, phrase or part of a contract should be given meaning and significance according to its importance in context of the contract. Phillips Petroleum Co. v. McCormick, 211 F.2d 361 (10th Cir.1954); Hondo Oil & Gas Co. v. Pan American Petroleum Corp., 73 N.M. 241, 387 P.2d 342, 15 A.L.R.3d 437 (1963). Further, in construing the contract, reasonable rather than unreasonable interpretations are favored by the law. Division No. 1360, etc. v. Topeka Transportation Co., 200 Kan. 29, 434 P.2d 850 (1967). It is not the province of the court to amend or alter the contract by construction and the court must interpret and enforce the contract which the parties made for themselves. Davis v. Merrick, supra.

Unlike the cases relied on by the Bank, the improvements introduced by the Bank for the processing of its records did not reduce the number of items to be processed. It merely changed the manner of processing, although the volume of items to be handled was not affected. According to the terms of the contract, the Bank agreed to process its full volume of activity through ADP until the contract terminated 180 days after notice. The case of Poston v. Western Dairy Products Co., 179 Wash. 73, 36 P.2d 65 (1934), sheds some light on the importance of such a termination provision. In that case a milk distributor agreed to buy from a producer all the milk that the distributor could, in the exercise of reasonable diligence and ordinary good faith, sell. The contract contained a termination clause requiring 90 days' notice of intention to terminate. The distributor terminated the contract by breaching it. The court there stated that:

"* * * Obviously one of the principal objects of the provision requiring ninety days' notice of intention to terminate the contract was to give respondents an opportuntiy to find or establish an outlet for their milk when appellant should cease to take it. * * *"

A reading of the agreement as a whole clearly reveals the intention of the parties; that the Bank desired to have ADP prepare completed reports of demand deposits, savings deposits, general ledger and installment loans of depositors, and to furnish the Bank information; that the Bank agreed to key punch all items in connection with these accounts so that ADP could process the items and prepare the requested reports; and that either party could effectively terminate the contract by giving 180 days' notice in writing to the other party.

■ The trial court was correct in concluding that the agreement contemplated performance by both parties during the 180-day period following the written notice and that the agreement was not to be construed as authorizing the Bank to suspend performance of its obligations to furnish key punch cards as provided in Section 1, and to pay as provided in Section 6 for services to be performed by it during the 180-day period following giving of notice to terminate under Section 11.

Finding no error, the judgment is affirmed.

It is so ordered.

MOISE and CARMODY, JJ., concur.