812 P.2d 777

**STATE of New Mexico, ex rel. Tom UDALL, Attorney General, Plaintiff–Appellant,**

v.

**COLONIAL PENN INSURANCE CO., Fireman's Fund Insurance Co., American Fund Insurance Co., Defendants–Appellees.**

and

**STATE of New Mexico, ex rel. Tom UDALL, Attorney General, Plaintiff–Appellant and Cross–Appellee,**

v.

**DEAN WITTER REYNOLDS, INC., Defendant–Appellee and Cross–Appellant.**

Nos. 19052, 19268.

Supreme Court of New Mexico.

May 8, 1991.

Rehearing Denied July 17, 1991.

Tom Udall, Atty. Gen., G.T.S. Khalsa, Asst. Atty. Gen., Santa Fe, for appellant.

Eaves, Darling & Porter, John M. Eaves, Albuquerque, for appellee Dean Witter Reynolds.

Montgomery & Andrews, William C. Madison, Neils L. Thompson, Albuquerque, for appellee Fireman's Fund.

Beall, Pelton, O'Brien & Brown, Gregory L. Beihler, Albuquerque, Jennings, Kepner & Haug, Phoenix, for appellee Colonial Penn.

## OPINION

BACA, Justice.

The state appeals from summary judgment granted in two lawsuits that have been consolidated on appeal. In appeal number 19,052 we affirm the summary judgment granted in favor of three insurers, defendants-appellees Colonial Penn Insurance Company (Colonial), Fireman's Fund Insurance Company, and American Insurance Company (the latter two responded together and are jointly referred to as "Fireman's Fund"). In appeal number 19,268 the state appeals summary judgment entered in favor of Dean Witter Reynolds, Inc. (Dean Witter), and we reverse.

On April 26, 1984, the State Investment Officer, Philip Troutman, purchased 75,000 shares of stock in Schlumberger, Inc. After placing the order, Troutman became aware that Schlumberger was not a United States corporation; in fact it was incorporated in the Netherlands Antilles, although it did business in the United States. Believing this investment may have been contrary to New Mexico law, Troutman contacted the attorney general's office on April 27th. That office advised Troutman to deal with the stock using the mandated prudent man test and on June 21st issued an opinion that the purchase was illegal. The stock was sold in 1986—the state claims a loss of approximately $1.2 million.

The state and Dean Witter had entered into a professional services contract dated September 28, 1983, whereby Dean Witter would advise the State Investment Council and Officer regarding investment of the equity portion of the State Permanent Fund and Severance Tax Fund. It is alleged that Dean Witter advised the state to purchase Schlumberger stock and that Dean Witter knew of the limitations on stock purchases.

The three insurance companies issued public employee blanket bonds covering New Mexico state employees, including Troutman, for unfaithful performance of their duties. In September 1985 the state notified appellees of potential claims on the bond arising out of the Schlumberger transaction. Colonial denied the claim in October. Relying on time-to-sue provisions in the contracts, the other insurers also denied the claim, in November 1988.

## I. NONPAYMENT ON THE PERFORMANCE BONDS—THE INSURERS.

### A. *Time-to-sue provisions do not violate public policy.*

The bond contracts all contained provisions similar to the following:[1]

This endorsement shall be deemed cancelled as to any Employee: (a) Immediately upon discovery by the Insured of any act on the part of such Employee which would constitute a liability of the Company under the applicable Insuring Agreement covering such Employee[.]

. . . .

No suit, action or proceeding of any kind to recover on account of loss under this endorsement shall be brought after the expiration of three years from the cancellation of this endorsement as an entirety provided, however, that if such limitation for bringing suit, action or proceeding is prohibited or made void by any law controlling the construction of this endorsement, such limitation shall be deemed to be amended so as to be equal to the minimum period of the limitation permitted by such law.

■ The state contends the time-to-sue provisions as asserted against the sovereign violate public policy and should be declared void. Our courts consistently have held that contractual limitations on actions, including time-to-sue provisions, will be enforced unless they violate public policy. *See, e.g., Green v. General Accident Ins. Co. of Am.,* 106 N.M. 523, 525, 746 P.2d 152, 154 (1987); *Diebold Contract Servs., Inc. v. Morgan Drive Away, Inc.,* 95 N.M. 9, 11, 617 P.2d 1330, 1332 (Ct.App. 1980). We reaffirm the principle that limitations on actions that violate public policy are unenforceable, but hold that the case at bar does not present such public policy

---

1. This language is quoted from Colonial's contract.

considerations to require us to negate a contractual provision.

The state argues that preservation of the public fisc constitutes a strong public policy violated by a limitation on the time to sue and refers to a line of authority holding that *statutes of limitations* cannot be asserted against the state to defeat a claim. *See, e.g., Ross v. Daniel,* 53 N.M. 70, 201 P.2d 993 (1949); *State v. Roy,* 41 N.M. 308, 68 P.2d 162 (1937). Such limits cannot be asserted against the state unless the statute expressly includes the state within its ambit, or the legislative intent is such that by clear implication the state is included. *Ross,* 53 N.M. at 75, 201 P.2d at 996; *Roy,* 41 N.M. at 312–13, 68 P.2d at 164–65.

A statute of limitations, however, differs from the provisions at issue in the instant case. The time-to-sue provisions are contractual clauses agreed to between the state and the insurers to apply to a specific issue. As such they more closely resemble a statute of limitations that by its terms expressly is applied against the state than a statute of general applicability.

The provisions also present a countervailing public policy consideration—the freedom to contract.

New Mexico ... has a strong public policy of freedom to contract that requires enforcement of contracts unless they clearly contravene some law or rule of public morals. "Great damage is done where businesses cannot count on certainty in their legal relationships and strong reasons must support a court when it interferes in a legal relationship voluntarily assumed by the parties."

*United Wholesale Liquor Co. v. Brown–Forman Distillers Corp.,* 108 N.M. 467, 471, 775 P.2d 233, 237 (quoting *City of Artesia v. Carter,* 94 N.M. 311, 314, 610 P.2d 198, 201 (Ct.App.), *cert. denied,* 94 N.M. 628, 614 P.2d 545 (1980)). This court has previously enforced contractual provisions against the state to the detriment of the sovereign. *See, e.g., Vinnell Corp. v. State,* 85 N.M. 311, 512 P.2d 71 (1973)

(state liable to construction contractor for increased costs caused by misleading specifications on theory of breach of implied warranty of correctness). We also have rejected the argument that a public contract should be construed liberally in favor of the public interest when to do so would be unreasonable and require abrogation of accepted rules of contract interpretation. *Schultz & Lindsay Constr. Co. v. State,* 83 N.M. 534, 536, 494 P.2d 612, 614 (1972).[2]

The state, nonetheless, contends that the provisions at issue were neither bargained for nor essential to the agreement and asserts, therefore, that the public interest inherent in the doctrine that statutes of limitations should not apply against the state outweighs the policy in favor of freedom to contract. Stated another way, if a time-to-sue provision is analogous to a statute of limitations that expressly includes within its purview the state, because the provision was not bargained for, the state has not consented to be governed by it. We find no evidence to support this contention. *See Koenig v. Perez,* 104 N.M. 664, 726 P.2d 341 (1986) (after movant makes out a prima facie showing for summary judgment, burden shifts to opposing party to show reasonable doubt). "Generally, a party who executes and enters into a written contract with another is presumed to know the terms of the agreement, and to have agreed to each of its provisions in the absence of fraud, misrepresentation or other wrongful act of the contracting party." *Smith v. Price's Creameries,* 98 N.M. 541, 545, 650 P.2d 825, 829 (1982). The state has offered no evidence to demonstrate that the contract was unconscionable or one of adhesion, or that it was in an unequal bargaining position with the insurers. *Cf. Guthmann v. La Vida Llena,* 103 N.M. 506, 709 P.2d 675 (1985); *Albuquerque Tire Co. v. Mountain States Tel. and Tel. Co.,* 102 N.M. 445, 697 P.2d 128 (1985). In *Sanchez v. Kemper Insurance Cos.,* 96 N.M. 466, 467, 632 P.2d 343, 344 (1981), we noted several policy reasons for time-to-sue

---

**2.** Moreover, the legislature has demonstrated its intent that the state should enter into and be bound by contracts by allowing suit based on

valid written contracts. *See* NMSA 1978, § 37–1–23 (Repl Pamp.1990).

provisions, including removal of uncertainty regarding the insurer's liability. Such a provision is an essential element of the bond contract and forms part of the bargain. Even if, as the state claims, it did not negotiate actively over the provisions, the limitations on the right to sue were part of the agreement and represented an element of the consideration.[3]

B. *Fireman's Fund is not estopped.*

■ Although it did not deny the claim until 1988, Fireman's Fund is not estopped from asserting the time-to-sue provisions. The state refers us to authority for the proposition that a time-to-sue provision is tolled in the period between the insurer's notice of the claim and its denial. *See Solomon Lieberman and Chevra Lomdei Torah v. Interstate Fire and Casualty Co.,* 768 F.2d 81 (3rd Cir.1985); *Ford Motor Co. v. Lumbermens Mut. Casualty Co.,* 413 Mich. 22, 319 N.W.2d 320 (1982). This rule has not achieved universal acceptance. *See International School Servs., Inc. v. Northwestern Nat'l Ins. Co.,* 710 F.Supp. 86 (S.D.N.Y.1989) (choice of law question presented by assertion of tolling issue). The facts presented, however, render that authority inapposite, and we express no opinion on that issue. The state gave Fireman's Fund notice of an act constituting *potential* liability in 1985—the state does not point to any evidence to support that it asserted a claim to recover a specific amount of loss before expiration of the three-year period. The state, simply by selling the stock, could have reduced the act constituting the potential liability to a dollar amount that could then be asserted against the insurer, but it did not. Fireman's Fund, although on notice of a potential claim, had no notice of an actual claim until after the stock was sold at a loss. The state has not indicated that such notice was given within three years, and we hold that, even if the time to sue would have been tolled after notice to the insured, the state did not present a cognizable claim within the required period.

Fireman's Fund also is not estopped to assert the three-year time-to-sue provision even though it gave notice to the state that the *statute of limitations* may affect payment on the bond. Equitable estoppel requires that the party asserting estoppel lacks knowledge of the truth and relies on the other party's misrepresentation. *See Albuquerque Nat'l Bank v. Albuquerque Ranch Estates, Inc.,* 99 N.M. 95, 101, 654 P.2d 548, 554 (1982). The state knew of the three-year time-to-sue provision. No evidence of the state's reliance on the insurer's statement and on the six-year statute of limitations has been presented, and, moreover, since the state knew of the contractual limitation, such reliance would not have been reasonable. *See C & L Lumber and Supply, Inc. v. Texas Am. Bank/Galeria,* 110 N.M. 291, 795 P.2d 502 (estoppel requires that reliance be reasonable).

C. *The time-to-sue provisions began to run when the illegal act was discovered.*

■ The state asserts that damages and even the fact of loss were not ascertainable until after the sale of the stock. Therefore, the cause of action did not accrue until it was remediable in court, and the time to file suit did not begin to run until the sale of the stock.

We disagree. The contract indicates that: (1) the time-to-sue was within three years of the cancellation of the bond, and (2) the bond was deemed cancelled when the state discovered any act by an employee that would constitute a liability on the bond. The illegality was discovered almost immediately after the state purchased the stock, and by its clear terms, the contract requires that suit be brought within three years of that date.

## II. SUMMARY JUDGMENT IN FAVOR OF DEAN WITTER.

A. *Filing of late notice of appeal was within court's discretion.*

Dean Witter filed a cross appeal, arguing that the court erred when it allowed the

---

**3.** Furthermore, an insurer need not demonstrate prejudice from the lack of timely filing. It must show only the breach of a time-to-sue

provision. *Green,* 106 N.M. at 525, 746 P.2d at 154; *Sanchez,* 96 N.M. at 468, 632 P.2d at 345.

state to file notice of appeal thirty-five days *after entry of judgment.* A notice of appeal must be filed within thirty days of entry of judgment. SCRA 1986, 12–201(A). The time period may be extended "upon a showing of excusable neglect or circumstances beyond the control of the appellant." 12–201(E)(2).

We review the court's decision to extend the time to file notice of appeal applying an abuse of discretion standard. *See Guess v. Gulf Ins. Co.,* 94 N.M. 139, 607 P.2d 1157 (1980). The circumstances below were sufficiently unique to excuse the state's failure to file in a timely manner, and we affirm the court's use of discretion.

### B. *Liability of the investment adviser—Dean Witter.*

The state sued Dean Witter claiming the investment adviser was liable for damages incurred by the state in the illegal purchase of the Schlumberger stock. The complaint alleged breach of contract, breach of fiduciary duty, negligent misrepresentation, and fraud.

■ The state maintains that there were genuine issues as to material facts in this case, making summary judgment inappropriate. *See State v. Integon Indem. Corp.,* 105 N.M. 611, 735 P.2d 528 (1987); SCRA 1986, 1–056(C). If genuine controversy as to material facts exists, a motion for summary judgment should be denied, and the case should proceed to trial. *Great W. Constr. Co. v. N.C. Ribble Co.,* 77 N.M. 725, 427 P.2d 246 (1967).

### 1. The purchase was illegal.

The state's claims are predicated on the illegality of the transaction giving rise to Dean Witter's contractual liability. Thus, as a threshold matter, we confront whether the purchase of stock in a corporation that does business and maintains corporate offices in the United States, but technically has been formed and registered abroad, is legal.

Our constitution provides in part that "stocks eligible for purchase [by the State Investment Officer] shall be restricted to those stocks of businesses incorporated within the United States." N.M. Const. art. XII, § 7. Legislation allows the state to invest in "common and preferred stocks and convertible issues of any corporation organized and operating within the United States." NMSA 1978, § 6–8–9(F) (Repl. Pamp.1988). The court below concluded that the term "incorporated" as used in the constitutional provision has the same meaning as the statutory clause, "organized and operating," and that a company "organized and operating within the United States" is also "incorporated within the United States," even though it technically may be incorporated outside of the United States.

Section 6–8–9 was adopted by the 1957 legislature—the same legislature that proposed the amended Article XII, Section 7 for ratification by the electorate—and the statute was promulgated contingent upon the constitutional amendment taking effect. Dean Witter suggests that the contemporaneous proposal of the amendment and adoption of the statute indicates that the terms—"incorporated within the United States" and "organized and operating within the United States"—must be interpreted to mean the same thing. We must determine, first, whether that assertion is correct, and, second, what the terms at issue mean.

■ We interpret our constitution to carry out its spirit, avoiding legal technicalities and subtle niceties. *Gomez v. Board of Educ.,* 76 N.M. 305, 309, 414 P.2d 522, 525 (1966).

"What the framers of the Constitution intended as disclosed by the language employed is, of course, the interpretation properly to be given the instrument.... We should, as nearly as we may, endeavor to look at the instrument from the vantage point of the framers the better to understand their view of the matter and the meaning likely intended....

... And whenever we refer to the framers that term is to be taken as embracing the people who adopted it. We are not unmindful of the rule of construction applicable to a Constitution that its language is to be taken in its common

and ordinary sense and as likely understood by the people who adopted it...." *State ex rel. Witt v. State Canvassing Bd.*, 78 N.M. 682, 691, 437 P.2d 143, 152 (1968) (quoting *Todd v. Tierney*, 38 N.M. 15, 24–25, 27 P.2d 991, 997 (1933)).

■ A contemporaneous construction by the legislature of a constitutional provision is a "safe guide to its proper interpretation," and creates "a strong presumption" that the interpretation was proper. *Humana of New Mexico, Inc. v. Board of County Comm'rs*, 92 N.M. 34, 582 P.2d 806 (1978).[4]

Dean Witter thus asserts that, pursuant to these canons of construction, we must find that the statute and amendment have identical meanings. We disagree. The statute and amendment have different meanings—it would torture the language to determine otherwise. In *State v. Ball*, 104 N.M. 176, 181, 718 P.2d 686, 691 (1986), we construed the constitution in light of legislative inaction—the contemporary legislators felt that an amendment did not compel a change in an existing statute.[5] If we had construed the constitution differently, we would have in effect determined that the contemporary legislators, with knowledge of the existing statute, had proposed the amendment yet not altered the conflicting and, therefore, unconstitutional statute. Here, on the other hand, we are not being asked to declare the statute unconstitutional,[6] and we are not forced to choose between the language of the constitution and a contemporaneous construction

by the legislature. The amendment and the statute can be construed to have different yet consistent meanings.

Nonetheless, we are asked to conclude that the statute and constitution are redundant. To the contrary, we believe the legislature intended some further restriction on investment by passing the statute.[7]

■ While we agree with Dean Witter that the statutory language "organized and operating within the United States" would include Schlumberger, we do not agree that Schlumberger is "incorporated within the United States" as required by the constitution. "Incorporated" is defined as "united in one body: formed into a corporation: made a legal entity." *Webster's Third International Dictionary* (1976). The plain meaning, as understood by the electorate when ratifying the constitutional amendment, requires that to be eligible for investment, the corporation must have been formed or made a legal entity in the United States. Schlumberger was formed and made a legal entity in the Netherlands Antilles. Accordingly, we hold the purchase violated Article XII, Section 7.

### 2. Delegation of the investment officer's duties.

■ The court determined the duties imposed by law on the State Investment Office, Officer, and Council were nondelegable as a matter of law; the contract did not delegate to Dean Witter any of the state's duties, nor did it require Dean Witter to

---

**4.** What we have meant by "contemporaneous construction," however, is not always clear. *Compare Humana*, 92 N.M. at 36, 582 P.2d at 808 (contemporaneous construction is construction given in light of modern, current conditions) *with State v. Ball*, 104 N.M. 176, 181, 718 P.2d 686, 691 (1986) (contemporary construction is that given by legislature in office at time amendment adopted).

**5.** *See also State ex rel. Gomez v. Campbell*, 75 N.M. 86, 400 P.2d 956 (1965). In *Campbell*, the framers did not change an existing statute when they adopted the constitution. Accordingly, we determined that the framers did not intend the constitution to alter that pre-existing law. *Id.* at 94, 400 P.2d at 962.

**6.** *Cf. Ball*, 104 N.M. at 178, 718 P.2d at 688 ("It is the duty of this Court to uphold statutes unless

it is satisfied beyond all reasonable doubt that the Legislature went outside the Constitution in enacting the challenged legislation."); *Board of Trustees v. Montano*, 82 N.M. 340, 481 P.2d 702 (1971) (presumption that statute as passed by legislature is constitutional); *Humana*, 92 N.M. at 36, 582 P.2d at 808 (same).

**7.** If the legislature had intended the statute to be identical to the constitution, it could have used the same language in both. It chose, however, to use different language, and we construe the intent in passing the statute to have been to create a different standard. *See Montoya v. McManus*, 68 N.M. 381, 362 P.2d 771 (1961) (legislative intent determined from language of act).

recommend only stock technically incorporated in the United States. The state argues that whether any of the responsibilities of the Investment Officer were or could have been delegated by contract to Dean Witter did not dispose of the issues in this case on summary judgment. It asserts that Dean Witter was contractually obligated to provide the state with investment advice consistent with legal requirements and maintains that Dean Witter is estopped to argue an illegal delegation.

Dean Witter contends the duties and responsibilities of the State Investment Officer, as set forth in Sections 6–8–4 and –7, cannot be delegated—possession by an outside advisor of even a portion of the State Investment Officer's decision-making power would be unlawful.

At issue in this suit are claims either on or relating to the contract for advice regarding investment of the Permanent Funds. It is not claimed, nor does it appear, that the contract was illegal. The question can be framed as an estoppel. Alternatively, it can be framed simply as, because this suit is not to hold Dean Witter liable for an act that state officers could not delegate but rather for lawfully-assumed contractual duties, Dean Witter's assertion that the state could not delegate its liability is not relevant to this lawsuit. The question is not whether, as a matter of law, Dean Witter could be delegated the duty to insure that constitutional requirements were met. To the contrary, the issue is whether, within the scope of the duties and potential liabilities established within the contractual relationship, Dean Witter was required to advise the state to make lawful investments. We hold that the contract did not delegate nondelegable duties to Dean Witter, and Dean Witter is estopped to assert that doctrine as a bar to suit on the contract.

### 3. The contract obligated Dean Witter to give advice that conformed to applicable law.

 The district court concluded that the contract did not obligate Dean Witter to provide advice consistent with New Mexico Constitution, Article XII, Section 7, or to recommend only stock of companies technically incorporated within the United States. A contract incorporates the relevant law, whether or not it is referred to in the agreement. *Montoya v. Postal Credit Union*, 630 F.2d 745 (10th Cir.1980). In construing a contract, the law favors a reasonable rather than unreasonable interpretation. *Brown v. American Bank of Commerce*, 79 N.M. 222, 441 P.2d 751 (1968). Contracts in violation of our public policy, as manifest in positive law, are unenforceable. *DiGesu v. Weingardt*, 91 N.M. 441, 443, 575 P.2d 950, 952 (1978) (split use of single liquor license would circumvent statute limiting number of licenses and contract to so do not enforceable). The state did not contract with Dean Witter for illegal investment advice. To interpret the contract otherwise would not be reasonable and potentially would place the contract in jeopardy of being declared unenforceable as violative of public policy. Thus, we hold that the contract included reference to the relevant constitutional provision.[8]

 The contract included a provision exculpating Dean Witter from liability for losses except those arising out of "knowing willful misfeasance, bad faith, or reckless disregard." Our review of the record indicates controverted material issues of fact with regard to "knowing willful misfeasance, bad faith, or reckless disregard" of Dean Witter's contractual obligations, including whether Dean Witter had notice of the constitutional limitations, and we reverse the award of summary judgment on the breach of contract claim.

### 4. A fiduciary relationship existed.

 The district court concluded the contract did not create a fiduciary duty between the state and Dean Witter; the facts of this case indicated that no fiduci-

---

**8.** It is irrelevant that the contract is unambiguous. *See Brown*, 79 N.M. at 226, 441 P.2d at 755 (interpretation of unambiguous contract must be reasonable and requires ascertaining of intent from language used).

ary relationship existed; Dean Witter did not breach a fiduciary duty, and Dean Witter was entitled to summary judgment on the state's claim of breach of fiduciary duty.

Dean Witter argues that a fiduciary duty is limited to trustee or quasi-trustee relationships, to certain principal-agent relationships, and to partnership relationships. We disagree. Investment advisers enter into relationships of " 'trust and confidence' with their clients." *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 190, 84 S.Ct. 275, 282, 11 L.Ed.2d 237 (1963).[9] In the Investment Advisers Act of 1940, 15 U.S.C. Sections 80b–1 to 80b–21 (1988), Congress recognized that the investment adviser is a fiduciary. *Capital Gains Research Bureau*, 375 U.S. at 194, 84 S.Ct. at 284. As a fiduciary, an adviser is under "an affirmative duty of 'utmost good faith, and full and fair disclosure of all material facts,' as well as an affirmative obligation 'to employ reasonable care to avoid misleading' his clients." *Id.* (quoting Prosser, *Law of Torts* 534–35 (1955), and 1 Harper & James, *The Law of Torts* 541 (1956)). Accordingly, we reverse the award of summary judgment on the cause of action for breach of fiduciary duty.

### 5. Causation.

■ There are material issues of fact regarding whether the advice given by Dean Witter caused the loss to the state. We do not view as a bar to recovery that the state, pursuant to legal requirements, did not immediately divest itself of ownership in the illegal stock. Nor do we find dispositive that state officers made the immediate decision to purchase the stock. The question is whether the advice was counter to a duty created by the contract, and whether such advice proximately caused the state's losses.

### 6. Tort claims in negligent misrepresentation and fraud.

In two separate counts, the state asserted causes of action in negligent misrepresentation and fraud. The court granted summary judgment on both, finding that Dean Witter did not misrepresent or omit material facts in connection with the stock purchase and did not commit fraud.

The state argues there are factual questions that made summary judgment inappropriate. Dean Witter asserts that an action in negligent misrepresentation is grounded in negligence principles, *Maxey v. Quintana*, 84 N.M. 38, 499 P.2d 356 (Ct. App.), *cert. denied*, 84 N.M. 37, 499 P.2d 355 (1972), and the state failed to show a duty or causation. We have already determined that the contract created a duty and that there was a question of fact regarding causation.

■ Dean Witter, however, contends in the alternative that we should affirm because a cause of action cannot be maintained where the misrepresentation is the same conduct upon which the claim for breach of contract is premised. *See Rio Grande Jewelers Supply, Inc. v. Data General Corp.*, 101 N.M. 798, 689 P.2d 1269 (1984); *Isler v. Texas Oil & Gas Corp.*, 749 F.2d 22 (10th Cir.1984). Dean Witter overstates the holding of *Rio Grande*.[10] We do agree, however, with the limited rule that the concept of freedom of contract and notions of contractually assumed duties and liabilities can act to limit general tort liability in certain circumstances when limited liability is expressly bargained for. *Isler*, 749 F.2d at 23. "No reason appears to support such a radical

---

9. "Fiduciary" has been defined as "holding in trust or confidence." *State v. Moss*, 83 N.M. 42, 44, 487 P.2d 1347, 1349 (Ct.App.1971); *see also Swallows v. Laney*, 102 N.M. 81, 84, 691 P.2d 874, 877 (1984) ("A fiduciary relationship exists in all cases where there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of one reposing the confidence.").

10. Moreover, neither party has addressed the effect of our decision in *Wilburn v. Stewart*, 110 N.M. 268, 794 P.2d 1197 (1990), on the rule as stated in *Rio Grande*. In *Wilburn*, we overruled that part of *Bell v. Lammon*, 51 N.M. 113, 179 P.2d 757 (1947), relied on by *Rio Grande* for the proposition that the parol evidence rule precluded admission of evidence regarding misrepresentation in the inducement. 110 N.M. at 270, 794 P.2d at 1199.

shift from bargained-for duties and liabilities to the imposition of duties and liabilities that were expressly negated by the parties themselves when they decided to abandon their status as legal strangers and define their relationship by contract." *Id.* The instant case illustrates that principle and does not require us to consider a broader rule.

 The contract contains an exculpatory clause, stating:

> The Contractor shall not be liable for any mistake in judgment or law or for any losses except those arising out of Contractor's own willful misfeasance, bad faith or reckless disregard of Contractor's obligations under this Agreement or as may be otherwise provided by law.

Thus, the parties contracted away liability for negligence in performance of the contractual duties, such as the negligent misrepresentation alleged here.

The exculpatory language does not, however, exclude liability for fraudulent misrepresentation. "Actionable fraud consists of misrepresentation of a fact, known to be untrue by the maker, and made with an intent to deceive and to induce the other party to act in reliance thereon to his detriment." *Cargill v. Sherrod,* 96 N.M. 431, 432–33, 631 P.2d 726, 727–28 (1981). Our examination of the evidence presented by the state to defeat the summary judgment motion indicates the existence of questions of fact regarding the fraud claim; thus summary judgment was inappropriate.

In accordance with the foregoing, we affirm in part and reverse in part, and we remand for trial in a manner not inconsistent with our opinion.

IT IS SO ORDERED.

SOSA, C.J., and FRANCHINI, J., concur.