The slip opinion is the first version of an opinion released by the Chief Clerk of the Supreme Court. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Chief Clerk for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: May 25, 2023

**No. A-1-CA-39835**

**HELEN LOPEZ, as Personal Representative of the Wrongful Death Estate of EULALIA M. PANTOJA-GONZALES,**

Plaintiff-Appellee,

v.

**TRANSITIONAL HOSPITALS OF NEW MEXICO, LLC d/b/a KINDRED HOSPITAL ALBUQUERQUE; and KATE ZILAR,**

Defendants-Appellants.

**APPEAL FROM THE DISTRICT COURT OF SANTA FE COUNTY**
**Francis J. Mathew, District Court Judge**

Fuqua Law & Policy, P.C.
Scott Fuqua
Santa Fe, NM

for Appellee

Quintairos, Prieto, Wood & Boyer, P.A.
Frank Alvarez
Jo Beth Drake
Dallas, TX

for Appellant Transitional Hospitals Corporation of New Mexico, LLC d/b/a Kindred Hospital–Albuquerque



Altura Law Firm
Andrew Indahl
Albuquerque, NM

for Appellant Kate Zilar

# OPINION

**BOGARDUS, Judge.**

{1}     Transitional Hospitals Corporation of New Mexico, LLC d/b/a Kindred Hospital—Albuquerque (the Facility), and Kate Zilar (collectively, Defendants) appeal the district court's denial of Defendants' motion to compel arbitration. At issue is an arbitration agreement (the Agreement) signed by Jorge Luis Denis Pantoja (Son) in connection with the admission of his mother, Eulalia M. Pantoja-Gonzales (Resident) to Kindred Hospital—Albuquerque. Defendants argue the district court erred in denying their motion to compel arbitration because: (1) Son had authority to agree to arbitration, (2) the Agreement was not unconscionable, (3) issues of arbitrability were delegated to the arbitrator for decision; and (4) Defendants' claims fell within the scope of the Agreement. We conclude that the terms of the Agreement do not clearly and unmistakably provide that gateway issues of arbitrability are to be decided by an arbitrator, rather than by the district court. The district court, therefore, did not err in proceeding to decide the gateway issues. On the merits of those issues, we agree with the district court that Son lacked agency authority under the terms of Resident's advance health-care directive at the time he signed the Agreement on her behalf, and therefore affirm.

## BACKGROUND

{2}    This case stems from a wrongful death and negligence suit arising from Resident's stay at the Facility. Son signed the Agreement on Resident's behalf in connection with Resident's admission to the Facility in November 2017.

{3}    Plaintiff Helen Lopez, as personal representative of Resident's estate, later filed suit for wrongful death and negligence. In response, Defendants moved to compel arbitration. After a hearing on the motion, the district court entered an order denying Defendants' motion to compel arbitration. Defendants appeal.

## DISCUSSION

{4}    "We apply a de novo standard of review to a district court's denial of a motion to compel arbitration." *Cordova v. World Fin. Corp. of N.M.*, 2009-NMSC-021, ¶ 11, 146 N.M. 256, 208 P.3d 901. "Similarly, whether the parties have agreed to arbitrate presents a question of law, and we review the applicability and construction of a contractual provision requiring arbitration de novo." *Id.* (internal quotation marks and citation omitted).

## I.    The District Court Did Not Err in Refusing to Submit the Issue of Arbitrability to Arbitration

{5}    The district court denied Defendants' motion to compel arbitration on several grounds, concluding Son lacked authority to sign the Agreement on Resident's behalf, the Agreement was unconscionable, and Plaintiff's claims based on intentional battery fell outside the scope of the Agreement. Defendants argue that

the district court lacked authority to rule on these gateway questions concerning the Agreement's validity, enforceability, and applicability under the following provision of the Agreement: "Any and all claims or controversies arising out of or in any way relating to this Agreement or [Resident's] stay at the [Facility] including disputes regarding interpretation of this Agreement . . . shall be submitted to alternative dispute resolution as described in this Agreement." This provision, Defendants contend, delegated gateway questions of arbitrability to an arbitrator, and the district court therefore erred in refusing to do so. We are unpersuaded.

{6}     "[G]ateway questions of arbitrability typically involve matters of a kind that contracting parties would likely have expected a court to decide, such as the validity of an arbitration provision, the scope of an arbitration provision, or whether an arbitration agreement covers a particular controversy." *Felts v. CLK Mgmt., Inc.*, 2011-NMCA-062, ¶ 17, 149 N.M. 681, 254 P.3d 124 (alteration, internal quotation marks, and citation omitted). "The general rule is that the arbitrability of a particular dispute is a threshold issue to be decided by the district court unless there is clear and unmistakable evidence that the parties decided otherwise under the terms of their arbitration agreement." *Id.* To determine whether there is clear and unmistakable evidence of the intent to delegate in this case, we examine the factors considered by the *Felts* Court and contrast those factors with the Agreement at issue here.

{7} The *Felts* Court began by looking at the plain language of the arbitration agreement. *Id.* ¶ 23. This Court noted that the title of the arbitration agreement and the first sentence of the agreement "unambiguously provide that all disputes were to be submitted to an arbitrator." *Id.* The arbitration agreement was titled, "Agreement to Arbitrate *All Disputes*," and the first sentence of the agreement was equally broad: "stating that the parties submit to arbitration *any and all claims, disputes or controversies* . . . aris[ing] out of . . . this [a]greement to [a]rbitrate [a]ll [d]isputes . . . *including disputes as to the matters subject to arbitration*." *Id.* (internal quotation marks omitted). This language, including the italicized clause, was determined to be the requisite "clear and unmistakable evidence . . ." that "the parties agreed to arbitrate all issues, including issues of arbitrability." *Id.*

{8} Here, by contrast, the Agreement is titled, "Voluntary Alternative Dispute Resolution Agreement Between Patient and Hospital," and the language at issue is included in a section titled, "Alternative Dispute Resolution (ADR) Agreement Provisions." These titles do not contain the same broad language as those in *Felts*. Moreover, the provision at issue lacks certain language that was persuasive in *Felts*—that "disputes as to the matters subject to arbitration" would be decided by an arbitrator. *See id*. We are not persuaded that the phrase relied on by Defendants, which includes "disputes regarding interpretation of this Agreement" in the disputes to be arbitrated, clearly and unmistakably indicates the parties' intent to delegate to

4

the arbitrator disputes regarding the existence, validity, and scope of the arbitration provision, normally decided by a court.

{9} Another provision in the Agreement supports our conclusion. The *Felts* Court also relied on the fact that the arbitration agreement referred to and incorporated the Code of Procedure of the National Arbitration Forum (NAF Code of Procedure) into the arbitration agreement. *Id.* ¶¶ 24, 25. This Court noted that the NAF Code of Procedure Rule 20 "expressly provides that an arbitrator has the authority to decide jurisdictional issues, including arbitrability questions regarding the existence, validity, and scope of an arbitration provision" and concluded "that the incorporation of the NAF Code of Procedure constitute[d] clear and unmistakable evidence of the parties' intent to delegate arbitrability issues." *Id.* ¶¶ 21, 24.

{10} Here, by contrast, the Agreement states, "[T]he provisions of the [Uniform] Arbitration Act, [NMSA 1978, §§] 44-7A-1 [to -32 (2001)], shall govern the arbitration." The Uniform Arbitration Act, in turn, provides that "[*t*]*he court* shall decide whether an agreement to arbitrate exists or a controversy is subject to an agreement to arbitrate." Section 44-7A-7(b) (emphasis added). The Agreement's incorporation of the provisions of the Uniform Arbitration Act indicates that the district court is empowered to decide whether an agreement to arbitrate exists or a controversy is subject to an agreement to arbitrate. Accordingly, we find no clear

and unmistakable evidence that the parties agreed to delegate the issue of arbitrability and turn now to the merits of the district court's decision.

**II.     The District Court Did Not Err in Denying Defendants' Motion to Compel Arbitration**

{11}    Defendants contend the district court erred in denying its motion to compel arbitration based on the court's incorrect conclusion that Son lacked authority to sign the Agreement on Resident's behalf. "When a party agrees to a non[]judicial forum for dispute resolution, the party should be held to that agreement." *Barron v. Evangelical Lutheran Good Samaritan Soc'y*, 2011-NMCA-094, ¶ 14, 150 N.M. 669, 265 P.3d 720 (internal quotation marks and citation omitted). However, "New Mexico courts have clearly distinguished those situations where lack of agreement by the parties renders an arbitration clause unenforceable." *Id.* ¶ 15; *see also Heye v. Am. Golf Corp.*, 2003-NMCA-138, ¶ 8, 134 N.M. 558, 80 P.3d 495 (stating that a legally enforceable agreement to arbitrate is a prerequisite to arbitration and without such agreement, parties will not be forced to arbitrate). For this reason, "[t]he party attempting to compel arbitration carries the burden of demonstrating a valid arbitration agreement." *Corum v. Roswell Senior Living, LLC*, 2010-NMCA-105, ¶ 3, 149 N.M. 287, 248 P.3d 329. "[A] valid arbitration agreement signed by a competent party binds that party's estate and statutory heirs in a subsequent wrongful death action." *Estate of Krahmer ex rel. Peck v. Laurel Healthcare Providers, LLC*, 2014-NMCA-001, ¶ 1, 315 P.3d 298.

{12}     Defendants argue that Son had the authority to enter into the Agreement on Resident's behalf as Resident's agent and under other grants of authority. We review these arguments in turn.

## A.     Defendants Failed to Establish Son's Authority Under Principles of Agency

{13}     Under principles of agency, an agent's agreement to a contract may bind the principal. *See MPC Ltd. v. N.M. Tax'n & Revenue Dep't*, 2003-NMCA-021, ¶ 30, 133 N.M. 217, 62 P.3d 308 (stating that in an agency relationship, the agent has power to bind the principal in dealings with third parties). The party asserting the existence of an agency relationship bears the burden of establishing such a relationship. *See Corona v. Corona*, 2014-NMCA-071, ¶ 22, 329 P.3d 701. To establish an agency relationship, the party must demonstrate "that the principal has in some manner indicated that the agent is to act for [them], and that the agent so acts or agrees to act on [their] behalf and subject to [their] control." *Totah Drilling Co. v. Abraham*, 1958-NMSC-102, ¶ 19, 64 N.M. 380, 328 P.2d 1083. Once an agency relationship is established, "the principal is [ordinarily] liable for the acts of [their] agent when acting within the scope of the agent's authority." *Stewart v. Potter*, 1940-NMSC-052, ¶ 17, 44 N.M. 460, 104 P.2d 736. The authority of an agent may be (1) actual, in that it "is given to the agent by the principal in terms that are express, or in terms that are implied from words or conduct of the principal to the agent or from the circumstances of the relationship"; or (2) apparent, in that it "arises

7

from manifestations by the principal to the third party and can be created by appointing a person to a position that carries with it generally recognized duties." *Barron*, 2011-NMCA-094, ¶ 16 (internal quotation marks and citations omitted). Accordingly, to prove a valid arbitration agreement sufficient to bind Resident's estate, Defendants bore the burden of demonstrating that Son had actual or apparent authority to sign the Agreement as Resident's agent. *See Corona*, 2014-NMCA-071, ¶ 22.

{14}     Defendants argue Son had authority to sign the Agreement, pursuant to the advance health-care directive (the Health-Care Directive) executed by Resident in 2003,[1] which listed Son as Resident's health-care agent. Moreover, Defendants contend that Son's authority under the Health-Care Directive was effective when Son signed the Agreement, pointing to the terms of the Directive.

{15}     The first paragraph of Resident's Health-Care Directive states, "This document shall take effect upon my incapacity." Several pages later, in paragraph thirteen, the Health-Care Directive states, "My agent's authority is effective as long

---

[1] Although Defendants refer to the document as a "Power of Attorney," Resident's Health-Care Directive refers to the Uniform Health-Care Decisions Act (the Act), NMSA 1978, §§ 24-7A-1 to -18 (1995, as amended through 2015), and provides instructions for Resident's healthcare. *See* § 24-7A-1(A) (providing that "'advance health-care directive' means an individual instruction or a power of attorney for healthcare made, in either case, while the individual has capacity"). Moreover, Defendants do not directly challenge the district court's determination that the document was a "health[-]care directive." Thus, to the extent Defendants contend the Health-Care Directive is a general power of attorney, we disagree.

as I am incapable of making my own health-care decisions." Defendants contend Resident was incapacitated when Son signed the Agreement because, at that time, Resident was incapable of making decisions for herself. Defendants also assert that a determination of incapacity was made—by Resident's physicians and by Son. In support of this assertion, Defendants point to medical records describing Resident's condition on and around the date of her admission to the Facility and during the time she remained at the Facility, as well as Son's deposition testimony that Resident could not make decisions during her time at the Facility. We are unpersuaded.

{16}     Because the writing at issue is an advance health-care directive, it is governed by the Act. *See* § 24-7A-4 (stating that the Act's provisions "govern the effect of . . . any . . . writing used to create an advance health-care directive"); *State ex rel. Udall v. Colonial Penn Ins. Co.*, 1991-NMSC-048, ¶ 30, 112 N.M. 123, 812 P.2d 777 ("A contract incorporates the relevant law, whether or not it is referred to in the agreement."). The Act provides:

> '[C]apacity' means an individual's ability to understand and appreciate the nature and consequences of proposed health care, including its significant benefits, risks and alternatives to proposed health care and to make and communicate an informed health-care decision. *A determination of lack of capacity shall be made only according to the provisions of Section 24-7A-11.*

Section 24-7A-1(C) (emphases added). Section 24-7A-11(C), in turn, provides that "[u]nless otherwise specified in a written advance health-care directive, a determination that an individual lacks . . . capacity or that another condition exists

9

that affects an individual instruction or the authority of an agent shall be made by two qualified health-care professionals, one of whom shall be the primary care practitioner." Defendants do not contend that two qualified health-care professionals, including Resident's primary care practitioner, had determined that Resident lacked capacity when Son signed the Agreement. Accordingly, we must determine whether the Health-Care Directive "specified" a different method different for determining whether Resident lacked capacity. *See* § 24-7A-11(C).

{17}    Because "specified" as used in Section 24-7A-11(C) is not defined, we are guided by the common and ordinary use of the term as ascertained by a dictionary. *See Battishill v. Farmers Alliance Ins. Co.*, 2006-NMSC-004, ¶ 8, 139 N.M. 24, 127 P.3d 1111 ("We . . . hold that the common and ordinary meaning . . . may be ascertained from a dictionary."). "Specify" means "to name or state explicitly or in detail."    *Merriam-Webster    Dictionary,*    https://www.merriam-webster.com/dictionary/specify (last visited Mar. 23, 2023). Here, the Health-Care Directive provides that "[t]his document shall take effect upon [Resident's] incapacity" but does not adopt a method by which that incapacity will be determined. Given the Health-Care Directive's failure to specify a method for determining Resident's capacity different from the one provided for by the Act, we conclude that the Health-Care Directive incorporates the default method specified by Section 24-7A-11(C) and intended by statute to supply a term of the parties to the contract have

not otherwise agreed. *See Yedidag v. Roswell Clinic Corp.*, 2015-NMSC-012, ¶ 51, 346 P.3d 1136 (explaining that "[d]efault rules supply terms that fill the gaps concerning issues on which parties can freely contract").

{18} The determination of incapacity by the statutory method incorporated in Resident's Health-Care Directive—made by "two qualified health-care professionals, one of whom shall be the primary care practitioner," *see* § 24-7A-11(C), took place approximately four months after Son signed the Agreement.

{19} Accordingly, Son's authority to act as Resident's health-care agent under the Health-Care Directive did not become effective until Resident was determined to be incapacitated, some weeks after the Agreement was signed. Because Son lacked authority to act as Resident's agent under the Health-Care Directive when he signed the Agreement, we need not decide whether the Directive would have granted Son the authority to enter into arbitration. *See Crutchfield v. N.M. Dep't of Tax'n & Revenue*, 2005-NMCA-022, ¶ 36, 137 N.M. 26, 106 P.3d 1273 ("A reviewing court generally does not decide academic or moot questions.").

{20} To the extent Defendants argue Son had authority to sign the Agreement as Resident's agent, even in the absence of authority under the Health-Care Directive, Defendants do not develop an argument based on apparent authority or argue that the Facility reasonably relied on the Health-Care Directive. *See Comstock v. Mitchell*, 1990-NMSC-054, ¶ 4, 110 N.M. 131, 793 P.2d 261 (stating that "a person

11

dealing with an agent must use reasonable diligence and prudence to ascertain whether the agent is acting within the scope of his powers" (internal quotation marks and citation omitted)). Indeed, the Facility's admission representative stated in her deposition that she never obtained Resident's Health-Care Directive during the admission process. To the extent Defendants point to Son's representations to the Facility that he had authority under the Health-Care Directive, "[t]o establish apparent authority, the relying party must base the relationship upon words or acts of *the principal*, and not the representations or acts of the agent." *Tercero v. Roman Cath. Diocese of Norwich, Conn.*, 2002-NMSC-018, ¶ 12, 132 N.M. 312, 48 P.3d 50 (emphasis added) (internal quotation marks and citation omitted)); *Totah Drilling Co.*, 1958-NMSC-102, ¶ 19.[2] Based on foregoing, Defendants have failed to carry

---

[2]Defendants also assert that "the testimony and evidence shows [Resident] . . . had a history of permitting [Son] to make decisions on her behalf and be involved in her care." Defendants, however, do not support this assertion with a citation to the record and fail to develop this argument around a principle of agency. Because this argument is not adequately developed, we decline to address it further. *See Corona*, 2014-NMCA-071, ¶ 28 ("This Court has no duty to review an argument that is not adequately developed."); *see also Pirtle v. Legis. Council Comm. of N.M. Legislature*, 2021-NMSC-026, ¶ 58, 492 P.3d 586 ("As a general rule, appellate courts rely on adversarial briefing to decide legal issues and avoid reaching out to construct legal arguments that the parties, intentionally or otherwise, have not presented.").

their burden of showing an agency relationship permitting Son to enter into arbitration on behalf of Resident. *See Corona*, 2014-NMCA-071, ¶ 22.

**B.      Defendants' Remaining Arguments Fail**

{21}    Defendants next argue that, even if Son lacked authority to act as Resident's agent under the Health-Care Directive, "th[is] Court could consider his authority as a surrogate under the . . . Act." We disagree.

{22}    The Act provides that "[a] surrogate may make a health-care decision for a patient who is an adult . . . if the patient has been determined *according to the provisions of Section 24-7A-11* . . . to lack capacity." Section 24-7A-5(A) (emphasis added). As discussed, Section 24-7A-11(C) provides that "[u]nless otherwise specified in a written advance health-care directive, a determination that an individual lacks . . . capacity . . . *shall be made by two qualified health-care professionals, one of whom shall be the primary care practitioner*." (emphases added). Again, no such determination had been made when Son signed the Agreement. Accordingly, Son did not meet the "statutory condition precedent" to permit him to act as Resident's health-care surrogate under the Act when he signed the Agreement. *See Corum*, 2010-NMCA-105, ¶¶ 9, 16.

{23}    Finally, Defendants argue that, "as the intended beneficiary of the admission and the . . . Agreement, [Resident] and [Son] are both bound, regardless of whether ...[Resident] gave specific authority for [Son] to sign." But apart from this assertion

13

and citations to several nonbinding cases, Defendants fail to develop an argument, which applies the facts of this case to controlling law. We cannot say this argument is adequately developed. *See Corona*, 2014-NMCA-071, ¶ 28.

**{24}** In sum, Defendants failed to carry their burden of demonstrating a valid arbitration agreement. *See Corum*, 2010-NMCA-105, ¶ 3. The district court therefore properly denied Defendants' motion to compel arbitration, and we need not reach Defendants' remaining arguments. *See Crutchfield*, 2005-NMCA-022, ¶ 36.

**CONCLUSION**

**{25}** For the foregoing reasons, we affirm.

**{26}** **IT IS SO ORDERED.**

_____
**KRISTINA BOGARDUS, Judge**

**WE CONCUR:**

_____
**J. MILES HANISEE, Judge**

_____
**JANE B. YOHALEM, Judge**

14