In re Carl I. VIDAL, Debtor.

Carl I. Vidal, individually and as a general partner of Gamerco Associates, Ltd., Plaintiff,

v.

Karen Head, Charles High, Phillip Ingram, Peter Ramsey, Gamerco Associates Limited No. One, Gamerco Associates Current Investment Limited Partnership No. Two and Gamerco Associates Land Holding Limited Partnership No. Three, Defendants/Counterclaimants.

Bankruptcy No. 11–96–10775 RA.
Adversary No. 98–1078 M.

United States Bankruptcy Court,
D. New Mexico.

May 24, 1999.

James A. Askew, Albuquerque, NM, for Defendants/Counterclaimants.

Walter L. Reardon, Jr., Albuquerque, NM, for Plaintiff.

### MEMORANDUM OPINION

MARK B. McFEELEY, Chief Judge.

THIS MATTER came before the Court on Carl I. Vidal's Complaint for Declaratory Judgment and Defendants'/Counterclaimants' Motion for Summary Judgment and Counterclaim. At issue is whether the three limited Gamerco Partnerships can extend their partnership terms by amending the partnership agreements, and whether the partnerships improperly removed Carl I. Vidal as a general partner. After a hearing on the merits, having examined the pleadings and the briefs submitted by counsel, and being otherwise fully informed, the Court finds that the language of the Gamerco partnership agreements is ambiguous and holds: 1) that the circumstances and the intent of the parties at the time they entered the agreements indicate that the partnerships cannot extend their terms with less than 100% approval of all partnership interests; and 2) that Carl I. Vidal was improperly removed as a general partner.

## FACTS AND PROCEDURAL HISTORY

Gamerco Associates Limited Partnership One ("Gamerco One") was formed in New Mexico in July 1976. It was funded from the assets of its predecessor corporation to avoid double taxation and provide for the orderly liquidation of the assets of that company. In January 1985, Gamerco Two and Three were formed in New Mexico from the assets of Gamerco One. Gamerco One, Gamerco Two and Gamerco Three will be referred to collectively as "Gamerco Partnerships." All three partnerships use the same partnership agreement entitled "Certificate and Agreement of Limited Partnership of Gamerco Associates, Ltd." ("Agreement"). At the time of their formation, there were four general partners, Allen B. Rollie, John R. Vidal, Jeannette Gartner, and Carl I. Vidal ("Vidal").

Under the existing Agreement, each of the Gamerco Partnerships terminates on May 31, 2006. The general partners have proposed two amendments to the Agreement: 1) to extend the partnership terms an additional thirty years; and 2) to convert the partnerships to limited liability companies.

The Agreement, at section 16.4, provides a procedure for making amendments to the Agreement.[1] The amendment provision requires that either the general partners or twenty-five percent of the partnership interests propose an amendment,[2] after which a verbatim statement of the amendment is given to all partnership interests. Next, the partnership interests vote on the amendment through either a written vote or a meeting. If a meeting is called, the Agreement at § 16.5 requires that the general partners "shall" state the reason for the meeting. Notice of this meeting must be given not less than seven days and not more than thirty days prior to the scheduled meeting. At the meeting, if eighty percent of all partnership interests approve, the amendment is adopted.

The proposal to amend the Agreement was put on a partnership meeting agenda for a meeting scheduled for April 19, 1998. The proposal to remove Vidal as a general partner was not on the agenda for the meeting. It is not clear when notice of this meeting was delivered.

At the April 19, 1998 meeting, in a non binding straw vote, 87.44% of the partnership interests approved amending the Agreement to convert the partnership to a limited liability corporation and to extend the life of the partnership an additional thirty years. One limited partner, J. Hodge was absent and did not vote. Vidal opposed both amendments.

At the same meeting, 85.08% of the partnership interests voted to remove Vidal as a general partner. There was no

---

1. That provision provides:

    16.4 Amendments. Amendments to this agreement may be proposed by the general partners or by the limited partners having an aggregate partnership percentage of 25% or more, and the general partners shall transmit to all partners a verbatim statement of any proposed amendment and may include in any such submission their recommendations as to the proposed amendment. The general partners shall seek a written vote of the limited partners on the proposed amendment or shall call a meeting of the limited partners to vote thereon and to transact any other business they deem appropriate ....A proposed amendment shall be adopted and become effective as an amendment herein if it receives the affirmative vote of the partners having an aggregate partnership percentage which is greater than 80%.

2. The language of this provision, "*the* general partners," suggests that all of the general partners must concur before proposing an amendment. It is unclear whether Vidal, who at that time was a general partner, agreed to propose these two amendments. However, any procedural irregularities in the proposal of these amendments were not before the Court. The current general partners nominally are Karen R. Head, Charles M. High, Phillip C. Ingram, and Peter G. Ramsey. Their cumulative interest is approximately 22.5%. The record does not indicate who the general partners were in 1998, before Vidal's removal.

cause to remove him. Section 11.2.1 of the Agreement provides that a general partner may be removed without cause by a vote of 75% of the limited partnership interest. A significant percentage, 37.93%, of the vote to remove Vidal was by proxy.

Subsequently, Vidal filed a Complaint for Declaratory Judgment as to whether the partnership could amend the agreement to increase the partnership term. The defendants filed a Counterclaim and a Motion for Summary Judgment.

## DISCUSSION

Under New Mexico law, the partnership agreement governs the relationship between general and limited partners. *See* NMSA 1978, §§ 54–2–1 to 54–2–63 (1996). The Agreement does not specifically address extending the stated term of the partnership. To the extent that a partnership agreement does not address an issue or event, the Uniform Limited Partnership Act (ULPA) governs, and on issues that it fails to address, the Uniform Partnership Act (UPA) governs. NMSA 1978, § 54–2–62 (1996). The ULPA does not address extending a partnership term.

Under the Revised UPA, effective July 1, 1997, a partnership formed prior to 1994 is governed by the partnership law that existed prior to the adoption of the act, unless the partnership elects to be governed by the 1994 act. NMSA 1978, § 54–1A–1005(a)(2) (1996) (effective July 1, 1997). The Gamerco Partnerships were formed prior to 1994 and have not elected to be governed by the 1996 act. Thus, the Gamerco Partnerships would be governed by the prior law. However, the law as amended prior to the 1994 act also does not address extending a partnership term.[3]

Both Vidal and Defendants look to the Agreement to settle this issue. They argue that the Agreement indirectly addresses whether the partnership term may be extended.

Defendants contend that through the powers given to the partners in § 16.4 ("Amendment Provision") of the Agreement, they may amend the Agreement to extend the life of the partnership if they have an affirmative vote of partners having an aggregate partnership percentage which is greater than 80%.

Vidal counters that according to § 9.4.1.7 ("Rights Provision") in the Agreement, the term of the partnership cannot be extended unless 100% of all limited partners approve. The Rights Provision

---

**3.** Vidal makes an unconvincing argument that the UPA does apply. He contends that since the ULPA looks to the UPA for situations for which the ULPA does not provide, then § 54–1–18(H) of the UPA applies here. The pertinent provision outlines the rights and duties of partners and states that "any difference arising as to ordinary matters connected with the partnership business may be decided by a majority of the partners; but no act in contravention of any agreement between the partners may be done rightfully without the consent of all the partners." NMSA 1978, § 54–1–18(H) (1996). His argument is that this provision mandates that 100% of all partnership interests must agree before the term of the partnership may be extended since such a change is not an ordinary matter and would be in contravention of the agreement. This argument is flawed for two reasons.

First, note that the issue here revolves around the rights and responsibilities of both general and limited partners. The ULPA does specifically address the rights and liabilities of general partners, NMSA 1978, § 54–2–25 (1996), and of limited partners, NMSA 1978, § 54–2–20 (1996). While the statute governing general partners is broad and looks to the UPA, the statute governing limited partners is specific and self-contained. With regard to limited partners, there is no reason to look to the UPA since the ULPA provides for them. More importantly, it may be argued that § 54–1–18(H), if applicable at all, would apply only to general partners and not limited partners since limited partners, by definition, have no control over "ordinary matters."

Second, this section refers to "acts in contravention of the agreement." Since it is the agreement itself which is at issue and the question is whether the agreement permits an extension of the partnership term through amendment, this provision merely sets up a circular argument: Is amending the partnership term an act in contravention of the agreement?

For these reasons, § 54–1–18(H) of the UPA does not apply.

provides that without the consent of all the limited partners, the general partners cannot "amend this agreement so as to change, in any respect, the rights and obligations of any limited partners." It is Vidal's position that changing the term of the partnership changes his rights and obligations as a limited partner, and therefore, 100% of the partnership interests must approve the extension of the partnership term or it cannot be extended.[4]

Defendants argue that the Rights Provision is a restriction only on what the general partners may do. It is not, they contend, a restriction on what the general and limited partners may do together. They claim that to read the Rights Provision as a restriction on the Amendment Provision makes the Amendment Provision meaningless. To support this argument, they point to several places within the Agreement that provide that the Agreement may be changed with less than a 100% vote.[5]

Vidal counters that unless the Rights Provision is read as a restriction on the Amendment Provision, it means nothing at all. Since general partners cannot amend the Agreement by themselves, the Rights Provision must apply to the Amendment Provision or it is superfluous.

■ Neither of these arguments are persuasive because both are circular: Vidal looks to the Rights Provision to restrict the Amendment Provision; Defendants look to the Amendment Provision to restrict the Rights Provision. The Court finds that it is unclear which provision controls. If an agreement is susceptible of different constructions, an ambiguity exists. *Vickers v. North Am. Land Dev., Inc.,* 94 N.M. 65, 68, 607 P.2d 603, 606 (1980). The Court finds that the Agreement, at best, is ambiguous.

■ When interpreting an ambiguous agreement, courts look to the intent of the parties and the facts and circumstances surrounding the execution of the agreement. *Mark V, Inc. v. Mellekas,* 114 N.M. 778, 781–82, 845 P.2d 1232, 1235–36 (1993).

The law under which this Agreement was written is an important means of discerning the intent of these parties when they created their Agreement as it is indicative both of what the partners were required to do when drafting this agreement and what they were prohibited from doing. This Agreement was created in New Mexico in 1976 and revisited again in 1985 when the second two partnerships were formed. At that time, under New Mexico law, the requirements for forming a limited partnership were different than they are today.

When the Gamerco Partnerships were formed in 1976 and 1985, the certificate of limited partnership was a controlling document.[6] New Mexico limited partnership law required that a partnership state its term on its limited partnership certificate. NMSA 1978, § 54–2–24 (repealed 1988).[7]

---

4. The Rights Provision would require 100% approval since "the general partners" must first propose a change which 100% of the limited partners must then approve.

5. Those provisions are as follows: § 11.1.1, naming a substitute general partner by 80%; § 11.1.5 substitute general partner in relation to certain tax attributes, 80% & 100%; § 11.2.1, removal of a general partner by 50% (with cause) or 70% (without cause); § 12.2, continuation after dissolution, under certain circumstances, 100%; § 16.5 calling of a meeting by limited partners with at least a 25% interest.

6. Unif. Limited Partnership Act § 201, cmt. (amended 1985) 6A U.L.A. 96 (1995) states:

The 1985 Act requires far fewer matters to be set forth in the certificate of limited partnership than did Section 2 of the 1916 Act and Section 201 of the 1976 Act. This is recognition of the fact that the partnership agreement, not the certificate of limited partnership, has become the authoritative and comprehensive document for most limited partnerships ....
New Mexico did not adopt any of the 1985 amendments until 1989.

7. This law required a certificate to be amended when "there is a change in the time as stated in the certificate for the dissolution of the partnership ...." NMSA 1978, 54–2–24(B)(8) (repealed 1988).

A limited partnership certificate could not be changed unless 100% of the partners approved. NMSA 1978, § 54–2–25 (repealed 1988).[8] This requirement was not subordinated to anything within a partnership agreement. Therefore, the term of a partnership could not be changed by an amendment procedure in the partnership agreement that required less than 100% approval of all partnership interests. Although this section has been repealed and no longer applies to the Gamerco Partnerships,[9] its existence then is significant because it is indicative of what the Gamerco partners thought they could and could not do when first they entered their partnership agreement. Since the law, as written then, forbade the extension of a partnership term without 100% approval by all partners, there was no need for the agreement to address this issue.

▪ A second principal of contractual construction is that courts strictly construe an agreement against its drafters in order to protect the rights of the party who did not draft it. *Schultz & Lindsay Construction Co. v. State of New Mexico*, 83 N.M. 534, 536, 494 P.2d 612, 614 (1972) (citing *Boswell v. Chapel*, 298 F.2d 502 (10th Cir. 1961)). The purpose of a partnership agreement is to delineate the rights of the partnership as a whole versus the rights of the individual partners. As a policy matter the agreement will be strictly construed to protect the rights of the individual partners.

▪ Since general partners are personally at risk for any deficiencies or liabilities of a limited partnership, they are deserving of special protection.[10] To read the Agreement as allowing the partnership to extend the term without a general partner's consent would allow the partnership to impose an indefinite obligation on a general partner against his will.[11] If the

---

**8.** In order to amend or cancel a limited partnership certificate, the partnership had to submit a writing which was "signed and sworn to by all members ...." NMSA 1978, § 54–2–25(A)(2) (repealed 1988). The subsequent law governing amendments or changes to a limited partnership does not require signed approval by any of the partners. NMSA 1978, § 54–2–10 (1996)

**9.** The Gamerco Partnerships were formed under the Uniform Limited Partnership Act. NMSA 1978, § 54–2–27 (repealed 1988). That act was amended and repealed in 1988. The new amended Act also called the Uniform Limited Partnership Act took effect in 1989. NMSA 1978, 54–2–1 (1996). By its own provisions, the 1988 Act applies to limited partnerships formed under the Uniform Limited Partnership Act, which the Gamerco Partnerships were. *See generally* NMSA 1978, 54–2–63 (1996) (effective September 1, 1989). Under New Mexico law, "A statute or rule that is revised, whether by amendment or by repeal and reenactment, is a continuation of the previous statute or rule and not a new reenactment to the extent that it contains substantially the same language as the previous statute or rule." NMSA 1978 § 12–2A–14 (1998). *See also* Uniform Statute and Rule Construction Act (1995) § 14 Continuation of Previous Statute or Rule. Therefore, when § 54–2–25 was repealed and rewritten in 1987 to delete the requirement that all limited partners approve a change in the partnership term, the old law no longer applied to the Gamerco partnerships.

**10.** NMSA 1978 § 54–2–33 (1996). NMSA 1978, § 54–2–25 (1996), NMSA 1978, § 54–1–18 (1996). Although general partners can withdraw from the partnership, if the withdrawal occurs before the expiration of the partnership term, it is a wrongful withdrawal and the general partner is liable for any damages to the partnership. NMSA 1978, § 54–2–33 permits a general partner to withdraw from a limited partnership with written notice at any time subject to the following limitation: "if the withdrawal violates the partnership agreement, the limited partnership may recover damages from the withdrawing partner for breach of the partnership agreement and offset the damages against the amount otherwise distributable to him."

**11.** The Agreement provides that a general partner may not "resign as a general partner except with the consent of the remaining general partner(s)." § 11.1.3. Vidal also cannot recover his contribution unless all of the general partners agree, the partnership dissolves, or is terminated. § 6.7, Article X. He cannot transfer or sell his interest without the acquiescence of all of the general partners. Article X. Additionally, to extend the partnership term means that Vidal will also be liable for any net losses that may accrue during the extended term of the partnership. § 8.1.

Agreement unambiguously provided that the partnership term could be extended through an amendment provision, then when the general partner entered into the agreement, he would have "constructively" consented to potentially enduring an indefinite obligation, even when he no longer wished to do so. Such a general partner would have effectively consented to a restriction on his rights. However, that is not the case here. As previously discussed, when this Agreement was created, it was not legally possible to extend the term without each and every partners' consent. When the Gamerco general partners' entered the Agreement and consented to the Amendment Provision, they did not consent to potentially enduring an infinite obligation.

■ Therefore, the Court finds that the Amendment Provision is not a valid means of changing the partnership term for two reasons: 1) at the time the Gamerco partners entered their Agreement the partners thought that they legally could not change the term of the partnership without 100% approval by all partnership interests; and 2) as a policy matter, general partners have a right not to be forced to be partners absent their consent. The Court holds that before the partnership term of the Gamerco Partnerships may be extended, 100% of all partnership interests must agree.

■ The second issue is whether the Gamerco Partnerships properly removed Vidal as a general partner. The Agreement provides that a meeting of the partners may be called by a general partner or by the limited partners having an aggregate partnership percentage of 25%

or more. It mandates that the call "**shall** state the reason for the proposed meeting." § 16.5 (emphasis added),[12] and that the notice shall be delivered not less than seven days or more than 30 days prior to the date of the meeting. The word "shall" is mandatory. "The purpose, meaning and intent of parties to contract is to be deduced from language employed by them; and where such language is not ambiguous, it is conclusive." *Davies v. Boyd,* 73 N.M. 85, 385 P.2d 950 (N.M.1963).

■ Here, the general partners did not comply with the notice provisions of the Agreement. The stated reason for the meeting was to discuss a potential amendment to the Agreement which would change the partnership to a limited liability corporation and extend the partnership term. There was never any indication that the meeting was called for any other purpose, namely, to remove Vidal as a general partner. Therefore, Vidal was improperly removed since adequate notice was not given.

## CONCLUSION

For the foregoing reasons, the Court declares that the Gamerco Partnership cannot extend the term of the partnership unless all of the partners approve and that Carl I Vidal was improperly removed as a general partner. This opinion constitutes the Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure. An appropriate judgment will be entered.

12. That provision provides:

16.5 *Meetings and Means of Voting.* A meeting of the partners may be called by the general partner or by limited partners having an aggregate partnership percentage of 25% or more. Such call shall state the reason for the proposed meeting. Notice of any such meeting shall be delivered to all partners in the manner prescribed in Section 16.1 hereof not less than seven (7) nor more than thirty

(30) days prior to the date of such meeting. Partners may vote in person or by power of attorney at any such meeting. Whenever the vote or consent of partners is permitted or required pursuant to this agreement, such vote or consent may be given at a meeting of partners or may be given in writing in accordance with the procedure of obtaining written vote prescribed in Section 16.4 of this agreement.