2001-NMCA-082

33 P.3d 651

**PUBLIC SERVICE COMPANY OF NEW MEXICO, Defendant–Appellant/Cross–Appellee,**

v.

**DIAMOND D CONSTRUCTION COMPANY, INC., Plaintiff–Appellee/Cross–Appellant.**

No. 21,590.

Court of Appeals of New Mexico.

Aug. 22, 2001.

Certiorari Granted Oct. 9, 2001.

Certiorari Quashed, No. 27,132, Oct. 16, 2001.

Thomas C. Bird, Eric R. Burris, Kathleen M. Regan, Keleher & McLeod, P.A., Albuquerque, NM, for Appellant/Cross–Appellee.

Jane Bloom Yohalem, Santa Fe, NM, Thomas J. Hynes, Farmington, NM, for Appellee/Cross–Appellant.

## OPINION

PICKARD, Judge.

{1} In this appeal we must decide whether the inclusion of an at-will termination clause in a contract relieves the parties of their duty, under the same contract, to use their best efforts to resolve disputes quickly and amicably. In addition, we must review the sufficiency of the evidence underlying the jury's award of punitive damages. Finally, we must determine whether the culpable mental states underlying punitive damages awards are synonymous with "tortious conduct, bad faith, intentional or willful acts," such that the 15 percent post-judgment interest rate set by NMSA 1978, § 56–8–4 (1993), should apply to all punitive damages awards.

{2} Defendant Public Service Company of New Mexico (PNM) appeals from a judgment awarding compensatory and punitive damages to Plaintiff Diamond D Construction Company, Inc. (Diamond D). At trial, the jury found that PNM breached its contract with Diamond D by failing to use its best efforts to quickly and amicably resolve a billing dispute and by wrongfully suspending work prior to terminating the contract. Before and after trial, PNM moved to dismiss Diamond D's claims on the grounds that (1) a contractual provision reserving the right to terminate the contract for any reason nullified all other provisions appearing to regulate the parties' dispute resolution rights and obligations, (2) PNM's refusal to verbally guarantee the adequacy of the workload after the parties had previously agreed to temporarily suspend work relieved PNM of its contractual obligation to provide an adequate workload up to the date of termination, and (3) the evidence was inadequate to show that PNM employees acted with a sufficiently culpable mental state to justify an award of punitive damages. The trial court rejected PNM's arguments and entered judgment on the jury's verdict. At the presentment hearing, Diamond D argued that it was entitled to an award of post-judgment interest at the rate of 15 percent per year, *see* § 56–8–4(A), based on the jury's finding that PNM had acted recklessly or wantonly in breaching the contract. The trial court rejected Diamond D's arguments and set the interest rate at eight and three-quarters percent. PNM appealed and Diamond D cross-appealed. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

{3} In May 1996, Diamond D and PNM entered into a contract for the remediation of contaminated pits in oil fields near Bloomfield, New Mexico. The remediation work involved excavating soil contaminated by dis-

charge from natural gas wells, spreading out the soil to allow the contaminants to evaporate, and then returning the decontaminated soil to the excavated pits.

{4} The remediation contract between PNM and Diamond D includes several provisions relevant to this appeal. First, a termination clause gives PNM the right to terminate a construction contract for any reason, with fifteen days written notice:

31.2 Notwithstanding any of the foregoing or anything in this Contract to the contrary, PNM shall have the right, at any time and for any reason whatsoever, including its own convenience, before completion of Work and upon fifteen (15) calendar days advance written notice, to suspend, abandon, or terminate said Work, or any portion thereof, and to terminate this Contract, without regard to whether or not Contractor has defaulted or failed to comply with the provisions of this Contract.

The parties agree that this provision was modified by a contract change that extended the period of performance from one year to until the project was completed or "until terminated by either party providing thirty (30) days written formal notice to the other party."

{5} The second relevant provision is a dispute resolution clause that imposes a duty on both parties to attempt a prompt and amicable resolution of all disputes:

32.1 Disputes on any matter relating to this Contract shall be discussed and resolved by authorized representatives of each Party who have the authority to bind the Party that they represent. The Parties shall use their best efforts to amicably and promptly resolve the dispute.

Finally, the contract requires that PNM "ensure that an adequate number of pits are available for remediation each week," for the duration of the contract.

{6} According to Diamond D and several PNM employees, the first two years of the remediation project went well. The project was within budget and on schedule, and the parties were able to amicably and informally resolve any disputes that arose. During the winter of 1996–1997, Diamond D and PNM agreed to stop remediation work temporarily because the cold weather prevented the contaminants from evaporating, and mud, snow, and frozen soil greatly slowed the digging process.

{7} The following winter, however, PNM decided not to stop the work and asked Diamond D to work on so-called "wet pits," where contaminants have been carried away from the discharge point by the watertable and which therefore require more extensive excavation and remediation than other sites. The clean-up techniques used on wet pits are not affected substantially by cold weather. PNM gave Diamond D a list of equipment that would be needed to complete the wet pit work and told Diamond D not to schedule other work for that equipment. Diamond D complied with PNM's request and turned down other work so that the equipment would be available.

{8} PNM gave Diamond D a list of five wet pits to remediate. The president of Diamond D testified that these pits were sufficient to keep Diamond D busy until the regular remediation project resumed in April 1998. Diamond D began working on the wet pits in January 1998.

{9} Between December 1997 and January 1998, PNM became aware that PNM field staff had made verbal changes to the contract with Diamond D. These changes were not put into writing, as required by the terms of the contract. In February 1998, PNM initiated an audit of the contract. The auditors were instructed to compare Diamond D's financial reports and invoices to the original, written contract. The auditors identified approximately $120,000 in discrepancies in Diamond D's invoices, which PNM concluded represented overbilling by Diamond D. Ultimately, however, PNM concluded that, with the exception of $10,000, the invoices were proper.

{10} On March 5, 1998, PNM sent a letter to Diamond D, ordering an immediate stop to the wet pit work. In the letter, PNM indicated that it was considering termination of its contract with Diamond D. Diamond D responded to the letter by making repeated telephone calls to PNM management, re-

questing that Diamond D be given an opportunity to discuss and attempt to resolve the billing disputes. All PNM employees contacted by Diamond D refused to discuss the dispute, instead referring Diamond D to another employee or promising to get back to Diamond D, but never doing so.

{11} On March 13, 1998, PNM sent Diamond D a notice of intent to terminate the contract. Diamond D responded by repeating its urgent telephone calls to PNM management, but encountered the same unwillingness of PNM staff to discuss the dispute. As Diamond D's president testified, "[w]e contacted every person [at PNM] that we knew a name to." Finally, on March 26, 1998, Diamond D's president wrote a letter to PNM's president, "agree[ing] that under the terms of the contract either party may cancel at any time by giving 30 days notice," but nonetheless stating that Diamond D had carried out its part of the contract and requesting that someone at PNM respond to Diamond D's attempts to resolve the issue regarding invoices. Diamond D followed up on this letter with repeated telephone calls. No action was taken by PNM, and the contract was terminated on April 12, 1998.

{12} Diamond D filed a complaint alleging that PNM breached the remediation contract and committed a prima facie tort. Only the contract claims are relevant to this appeal. Diamond D's breach of contract claims were based on (1) the failure of PNM to use its best efforts to amicably and promptly resolve the billing dispute, as required by Clause 32.1 of the general provisions and (2) the failure of PNM to provide Diamond D with pits to remediate between the date of PNM's notice that work under the contract would be suspended and the date PNM's termination of the contract became effective. Diamond D sought compensatory and punitive damages. The punitive damages claim was based on allegations that PNM had acted recklessly in refusing to meet with Diamond D representatives and had wantonly disregarded Diamond D's rights under the contract.

{13} PNM responded by filing a motion for summary judgment, which was denied by the trial court. The case was tried before a jury. The jury found that PNM had breach-ed the contract and awarded Diamond D $25,000 for PNM's failure to provide adequate pits and $365,000 for PNM's failure to attempt resolution of the billing dispute. In addition, the jury awarded Diamond D $1.5 million in punitive damages, finding that PNM's violation of the contract was wanton and reckless.

{14} At the presentment hearing, Diamond D argued that it was entitled to post-judgment interest at the 15 percent rate provided by Section 56-8-4(A) for judgments based on "tortious conduct, bad faith, intentional or willful acts." The trial court rejected Diamond D's argument and set the post-judgment interest rate at eight and three-quarters percent.

{15} PNM appeals, and Diamond D cross-appeals. On appeal, PNM argues that (1) the termination provision of the contract had precedence over the dispute resolution clause, and therefore Diamond D's claim for breach of the contract fails as a matter of law; (2) the evidence was insufficient to find that PNM breached the "adequate number of pits" provision of the contract given that the parties had agreed to suspend work during the previous winter and PNM had not verbally guaranteed that work would continue through the winter at issue; and (3) the evidence was insufficient to sustain a finding that PNM breached the remediation contract with a culpable state of mind, and therefore the trial court erred in refusing to vacate the jury's award of punitive damages. On cross-appeal, Diamond D argues that the language and history of Section 56-8-4(A) evince a legislative intent that the higher 15 percent post-judgment interest rate be imposed on all punitive damages awards, or, in the alternative, be imposed on the award in this case.

## II. DISCUSSION

### A. Breach of Contract

#### 1. *Standard of Review*

{16} Whether the trial court erred in denying motions for summary judgment, directed verdict, and a new trial on the issue of whether the termination clause took precedence over and controlled the dispute resolution clause as a matter of law is a question of

law which we review de novo. *See Mitchell–Carr v. McLendon*, 1999–NMSC–025, ¶ 30, 127 N.M. 282, 980 P.2d 65 (holding that a party's entitlement to judgment as a matter of law is reviewed de novo); *W. Farm Bureau Ins. Co. v. Carter*, 1999–NMSC–012, ¶ 4, 127 N.M. 186, 979 P.2d 231 (holding that interpretation of a contract is an issue of law that is reviewed de novo). In reviewing for sufficiency of the evidence, we use the substantial evidence standard. Under this standard, we view the evidence in the light most favorable to support the jury's verdict, drawing all reasonable inferences and resolving all disputed facts in favor of the verdict. *Ponder v. State Farm Mut. Auto. Ins. Co.*, 2000–NMSC–033, ¶¶ 6–7, 129 N.M. 698, 12 P.3d 960.

### 2. Dispute Resolution

{17} PNM argues that, as a matter of law, the at-will termination clause precludes the jury's finding that PNM breached its agreement to attempt an amicable and prompt resolution of the billing dispute. PNM's position is premised on its assertion that the only possible basis for the jury's finding of a breach must have been its interpretation that the dispute resolution clause modified the at-will termination provision such that the parties could not exercise their right to terminate for any reason without first attempting to resolve any disputes related to the contract. Based on its formulation of the issue, PNM claims that we must find that the termination provision takes precedence over and controls the dispute resolution clause, disallowing what it argues are damages based on termination of the contract, because (1) the contract's termination and dispute resolution clauses irreconcilably conflict; (2) the termination provision is a "change" that has precedence over all other provisions of the contract; and (3) the introductory language of the at-will termination clause, which states that the clause applies "[n]otwithstanding any of the foregoing or anything in this contract to the contrary," expressly trumps the dispute resolution clause.

{18} Diamond D asks us to reject PNM's formulation of the issue. Instead, Diamond D contends that the jury was asked to determine (1) whether PNM breached the dispute resolution clause by failing to use its best efforts to attempt an expedient and amicable resolution of the billing dispute and (2) whether Diamond D suffered damages as a result of this breach. Under Diamond D's formulation of the issue, the termination of the. contract is relevant only insofar as Diamond D was able to prove that breach of the dispute resolution clause was the likely cause of the termination and the proximate cause of the resulting loss of profits. We agree with Diamond D's formulation, and in so doing, we note that the jury did not decide the issue of which clause took precedence-the dispute resolution clause or the termination clause. That issue was determined by the trial court when it submitted to the jury the issue of damages caused by the breach of the dispute resolution clause. The jury was not instructed to interpret the contract or to determine the intent of the parties, and it did not have to do so in reaching its verdict under the instructions given. We therefore address the legal issue determined by the trial court.

{19} In deciding this appeal, we rely on several basic rules of contract interpretation. First, we view the contract as a harmonious whole, give meaning to every provision, and accord each part of the contract its significance in light of other provisions. *See id.* ¶ 8, 12 P.3d 960; *Manuel Lujan Ins., Inc. v. Jordan*, 100 N.M. 573, 575, 673 P.2d 1306, 1308 (1983). We will not interpret a contract such that our interpretation of a particular clause or provision will annul other parts of the document, unless there is no other reasonable interpretation. *See Casias v. Cont'l Cas. Co.*, 1998–NMCA–083, ¶ 13, 125 N.M. 297, 960 P.2d 839. "Apparently conflicting provisions must be reconciled so as to give meaning to both, rather than nullifying any contractual provision, if reconciliation can be effected by any reasonable interpretation of the entire instrument in light of the surrounding circumstances." 17A C.J.S. *Contracts* § 324, at 348–49 (1999) (footnotes omitted) (citing Restatement (Second) of Contracts § 203(a) (1981)). Finally, we strictly construe a contract against the party who drafted the contract in order to protect the rights of the party who did not

draft it. *See In re Vidal*, 234 B.R. 114, 119 (Bankr.D.N.M.1999); *Schultz & Lindsay Constr. Co. v. State*, 83 N.M. 534, 536, 494 P.2d 612, 614 (1972).

{20} PNM's contentions would require us to interpret the contract in violation of the well-established rule that particular provisions should not be read to annul other provisions unless there is no other reasonable interpretation. *See Casias*, 1998 NMCA 083, ¶ 13, 125 N.M. 297, 960 P.2d 839. It is unnecessary to read the dispute resolution provision as conditioning or limiting the parties' rights to terminate at any time and for any reason. We understand these two provisions to be coextensive: either party may terminate for any reason or no reason at all, but if the termination is the result of a dispute, the party must also use its best efforts to attempt a resolution of the dispute within the thirty days remaining before the termination becomes effective. *See Mayfield Smithson Enters. v. Com –Quip, Inc.*, 120 N.M. 9, 14, 896 P.2d 1156, 1161 (1995) (stating that provisions of a contract will not be read to nullify other provisions). Attempts to quickly and amicably resolve disputes benefit the parties beyond merely staving off potential termination. In this case, for example, as a result of the ongoing dispute, PNM refused to accept Diamond D's bid on another project, despite the fact that Diamond D was the low bidder, ceased inviting Diamond D to bid on projects for which Diamond D was qualified, and delayed payment of approximately $55,000 owed to Diamond D for work performed under the remediation contract.

{21} When both provisions are triggered-as in this case where the billing dispute likely resulted in the termination of the contract-the contract allows PNM to give immediate notice of intent to terminate, without requiring PNM to attempt resolution first, as long as PNM nonetheless uses its best efforts to amicably and promptly resolve the dispute within the time remaining prior to the date on which the termination becomes effective. *See Brown v. Am. Bank of Commerce*, 79 N.M. 222, 226, 441 P.2d 751, 755 (1968) (holding that a termination provision requiring ninety-days notice required that both parties continue to abide by terms of contract from date notice given until date termination became effective). It is unnecessary for us to read the contract as requiring PNM to allow Diamond D to attempt to persuade it to reinstate the contract, and we do not understand Diamond D to assert this position; nor do we understand the court or the jury to have found such an interpretation.

{22} We also reject PNM's attempt to portray Diamond D's letter to PNM's president as evidence of Diamond D's "practical interpretation" of the contract to allow PNM to terminate without attempting to resolve the dispute. Diamond D's letter is consistent with our interpretation of the contract: after acknowledging that PNM had the right to terminate the contract, Diamond D explained that it had questions concerning the billing dispute, described its attempts to meet with PNM representatives to resolve the dispute, and again requested the opportunity "to meet with someone to express our side of this issue." Diamond D did not ask that the contract be reinstated or that PNM delay its decision to terminate until after the parties had attempted to resolve the billing dispute. Instead, Diamond D merely asked that PNM attempt an amicable resolution of the dispute in spite of the fact that the contract had been terminated.

{23} The jury instructions likewise support our understanding of the contract and of the jury's finding of breach. The jury was instructed that, to find that PNM breached its duty to attempt a prompt and amicable resolution of the billing dispute, the evidence must show that:

1. Plaintiff and Defendant entered into the Remediation Contract.

2. Under the terms of the Remediation Contract, Defendant had the obligation to discuss and attempt to amicably and promptly resolve disputes which related to the contract prior to terminating the contract.

3. Defendant refused to discuss with Plaintiff disputes arising from the contract and to attempt to amicably and promptly resolve such disputes.

4. Plaintiff was damaged as a result of Defendant's refusal to discuss such disputes and amicably and promptly resolve disputes which related to the contract.

PNM focuses its interpretation of the issue on the phrase "prior to terminating the contract." Diamond D counters that this phrase merely describes the time period during which PNM breached the contract, and it does not direct the jury to consider whether PNM's right to terminate the agreement was contingent on the fulfilment of its duty to attempt to resolve the underlying dispute.

{24} We read jury instructions as a whole and resolve ambiguities by referring to other parts of the instructions. *See Allsup's Convenience Stores, Inc. v. N. River Ins. Co.,* 1999–NMSC–006, ¶ 46, 127 N.M. 1, 976 P.2d 1; *McCarson v. Foreman,* 102 N.M. 151, 158, 692 P.2d 537, 544 (Ct.App.1984). In this case, other sections of the instructions support Diamond D's position that the jury was asked to determine only whether PNM breached its duty to attempt resolution and not whether the resolution clause modified PNM's contract termination rights. For example, in describing the relief sought by Diamond D, the introduction to the instruction on breach of the dispute resolution clause states: "Plaintiff seeks compensation from ... Defendant for damages which Plaintiff claims were proximately caused by Defendant's refusal to attempt to resolve disputes between Plaintiff and Defendant." Later the instruction informed the jury that Diamond D bore the burden of proving "that the refusal of Defendant to discuss disputes and attempt to amicably and promptly resolve such disputes was the proximate cause of Plaintiff's damages." Read together, these instructions directed the jury to consider PNM's behavior from the date the dispute arose in January 1998 until the contract termination became effective on April 12, 1998. This instruction was a correct statement of the law insofar as PNM's duties under the contract continued until the contract was terminated. *See Brown,* 79 N.M. at 226, 441 P.2d at 755.

{25} We note that Diamond D's proposed jury instructions did not include the limiting phrase "prior to terminating the contract." Instead, the proposed instructions merely asked the jury to determine whether the evidence showed that PNM had a duty to attempt to resolve disputes "which arose ... during the terms [sic] of the contract." The termination language was added at the insistence of PNM's attorneys. After the jury returned its verdict, Diamond D moved to supplement the record to include its original instructions to prevent PNM from making the very claim it now makes on appeal. Insofar as PNM is arguing that the jury instructions were legally incorrect or confusing, it is precluded from making this argument by its interjection of the error. *Harrison v. ICX, Ill.-Cal. Express, Inc.,* 98 N.M. 247, 252, 647 P.2d 880, 885 (Ct.App. 1982).

{26} In its reply brief, PNM argues that the jury instructions are irrelevant because the verdict was subsumed by the judgment, which states that the jury found that PNM breached the contract by "terminating ... without first attempting to resolve disputes." We reject this argument. If the meaning of a judgment is ambiguous, the entire record may be used to properly construe the judgment. *Russell v. Russell,* 106 N.M. 133, 136, 740 P.2d 127, 130 (Ct.App. 1987). In this case, the jury was properly instructed and the trial court was aware that Diamond D's claim was not for improper termination of the contract but was for failure to attempt an amicable and expedient resolution of the dispute.

{27} Finally, we reject PNM's contention that in seeking loss-of-profit damages Diamond D's real position all along was that the breach in question was the act of terminating the contract, not the refusal to discuss and attempt to resolve the billing dispute. We recognize that loss-of-profit damages are ordinarily awarded for a wrongful termination of contract. However, the unique facts of this case support the award of such damages for breach of the dispute resolution clause. For contract termination loss-of-profit damages to be awardable, the necessary proximate cause connection had to be that, but for PNM's refusal to discuss and attempt to resolve the billing dispute, the

dispute would likely have been amicably resolved, giving PNM no reason to want to exercise its at-will termination right and resulting in a continuing amicable contractual relationship between the parties. The theory of Diamond D's case was that PNM's preclusion of that likely result through a contract termination entitled Diamond D not solely to damages directly flowing from the billing dispute prior to termination, but also to loss of profits arising from any cause linked to the breach of the dispute resolution clause, including the resulting termination of the contract. The evidence introduced at trial supported Diamond D's theory.

{28} PNM did not object to the jury instructions. By failing to object, PNM is in no position to complain about the theories of liability, proximate cause, and damages as they were given to the jury. In addition, PNM does not challenge the jury's finding that PNM failed to use its best efforts to promptly and amicably resolve the billing dispute, nor does it challenge the jury's finding that PNM's breach of the dispute resolution clause was the proximate cause of Diamond D's damages. An unchallenged finding by the trial court is binding on appeal. *Stueber v. Pickard,* 112 N.M. 489, 491, 816 P.2d 1111, 1113 (1991). Because we have rejected PNM's interpretation of the contract, and sufficient evidence was presented below to support Diamond D's claims that PNM breached the dispute resolution provision and that the breach was the proximate cause of the damages, we affirm the award of $365,000 for breach of the dispute resolution clause.

{29} In so doing, we wish to note that PNM cannot justifiably complain about the court's refusal to determine as a matter of law that the termination clause took precedence and controlled over the dispute clause. PNM drafted the contract. An express promise in a contract requiring a party to take certain action that can be rendered superfluous and useless simply upon giving notice of termination of the contract, or by terminating the contract, is illusory. A dispute resolution provision like the one in the contract at issue is for the salutary purposes of preserving an ongoing business relationship and reducing delay and cost. A contracting party whose form of contract contains a dispute resolution provision juxtaposed with a purported at-will termination provision without an unambiguous, clear, obvious, and explicit explanation of the differences between the provisions and a statement that the contract can be terminated whether or not a party uses its best efforts to resolve any particular dispute is simply inviting litigation. We see no error in denying PNM's request to take the case from the jury where PNM has set the contract up to unambiguously obligate itself to work out disputes while at the same time appearing to give itself unbridled discretion to disregard that obligation by terminating the contract under the at-will termination clause.

### 3. Adequate Pits

{30} At trial, the jury found that PNM breached the remediation contract by suspending work from March 9, 1998, until April 12, 1998, when the termination took effect. PNM argues that the jury erred in making this finding for two reasons: (1) the terms of the contract allowed PNM to suspend work for any reason and (2) the evidence showed that the parties did not intend to extend the adequate pits requirement through the winter months, given that the regular remediation work could not be performed efficiently during this period, and the parties had agreed to suspend work during the previous winter.

{31} While it is true that the termination clause gave PNM the right to suspend work for any reason, the clause also required that PNM give Diamond D a certain number of days notice before the suspension became effective. PNM's strained interpretation of its right to suspend work would render the notice requirement superfluous insofar as PNM could terminate the contract and suspend work on the same day, effectively resulting in an immediate termination that was contrary to the contract. We will not read a particular provision of a contract such that another provision is rendered meaningless. *See Mayfield Smithson Enters.,* 120 N.M. at 14, 896 P.2d at 1161.

{32} PNM argues that because the parties agreed to suspend work during the previous winter and PNM representatives made no assurances that the wet pit work would continue through to the spring season, PNM did not breach the contract. We view PNM's argument as a claim that the evidence was insufficient to sustain the jury's finding. In reviewing PNM's claim, we view the evidence in the light most favorable to support the jury's verdict, drawing all reasonable inferences and resolving all disputed facts in favor of the verdict. *Ponder,* 2000–NMSC–033, ¶¶ 6–7, 129 N.M. 698, 12 P.3d 960; *see also C.R. Anthony Co.,* 112 N.M. at 509, 817 P.2d at 243.

{33} Although Diamond D agreed to a shutdown the previous winter, the evidence showed that Diamond D did not agree to the shutdown prior to the termination of the contract. To the contrary, the parties had agreed that Diamond D would continue to work through the winter of 1997–1998. In addition, PNM reserved the equipment necessary for completing the wet pit work and told Diamond D not to schedule this equipment for any other jobs. Diamond D's understanding that PNM would provide an adequate number of pits for it to remediate was evidenced by Diamond D's declination of other work during this period. Although PNM representatives may have said that they could not guarantee that work would be sufficient to keep Diamond D busy until April, Diamond D representatives testified otherwise.

{34} PNM representatives testified only that they were unsure whether the available wet pit remediation projects would last until April because they could not accurately predict how much time would be required to remediate each wet pit. Although PNM believed it could suspend the winter work at any time, there was no evidence that anyone at PNM conveyed this belief to Diamond D.

{35} The president of Diamond D testified that the five pits assigned in January 1998 were sufficient to keep Diamond D busy until the regular remediation project resumed in April 1998. When PNM suspended work on March 9, 1998, Diamond D was still working on the first of these five pits and had yet to begin work on the remaining four pits. We hold that this evidence is sufficient to support the jury's verdict that PNM breached the adequate pits provision of the contract by failing to provide Diamond D with pits from March 9, 1998, until April 12, 1998.

### B. Punitive Damages

#### 1. Standard of Review

{36} PNM suggests that this Court should review the sufficiency of the evidence underlying the jury's award of punitive damages de novo. This is an incorrect statement of the standard of review in this case involving solely a challenge to the sufficiency of the evidence. As with all challenges to the factual findings, we review the findings underlying the jury's award of punitive damages to determine whether those findings are supported by substantial evidence. *Allsup's Convenience Stores, Inc.,* 1999 NMSC 006, ¶ 28, 127 N.M. 1, 976 P.2d 1. Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* On appeal, all disputed facts are resolved in favor of the jury's findings, all reasonable inferences are indulged in support of the verdict, and all evidence and inferences to the contrary are disregarded. *Haaland v. Baltzley,* 110 N.M. 585, 588–89, 798 P.2d 186, 189–90 (1990).

#### 2. Discussion

{37} An award of punitive damages for breach of contract may be sustained on appeal only if the evidence shows a culpable state of mind. *Allsup's Convenience Stores, Inc.,* 1999–NMSC–006, ¶ 53, 127 N.M. 1, 976 P.2d 1. We require "the presence of aggravated conduct beyond that necessary to establish the basic cause of action in order to impose punitive damages." *Teague–Strebeck Motors, Inc. v. Chrysler Ins. Co.,* 1999–NMCA–109, ¶ 78, 127 N.M. 603, 985 P.2d 1183 (order on motion for rehearing). A defendant acts with a culpable state of mind when the evidence shows that the defendant acted with reckless disregard for the rights of the plaintiff or that the defendant knew that its actions could harm the interests of

the plaintiff but failed to exercise care to avoid such harm. *See Paiz v. State Farm Fire & Cas. Co.*, 118 N.M. 203, 211, 880 P.2d 300, 308 (1994).

{38} PNM argues that there was no evidence that PNM failed to attempt resolution of the billing dispute with a culpable state of mind because (1) the PNM executive responsible for the decision to terminate reasonably interpreted the contract to allow termination without attempting resolution of the underlying dispute and (2) the ambiguity of the contract, namely whether the dispute resolution and termination provisions conflicted, precluded a finding that PNM acted recklessly or wantonly. We disagree with both contentions.

{39} The evidence showed that PNM initiated its audit of Diamond D in February 1998. That same month, PNM wrote to Diamond D asking Diamond D to respond to the overbilling identified by the auditors. Diamond D responded to this request the following day by submitting corrected invoices and explaining that the errors were due to clerical errors. Without checking to see if Diamond D had complied with its request for information, PNM suspended the contract five days later.

{40} In its letter suspending the contract, PNM explained that the suspension was justified because no work authorizations had been issued as required by the contract. Other evidence showed, however, that no work authorizations had been issued to Diamond D in the two years prior to the billing dispute. Although PNM had an absolute right to suspend or terminate the contract with adequate notice, the fact that it premised its suspension on the lack of a work authorization when other evidence suggested that the real reason for the suspension was the billing dispute supports an inference that PNM understood its obligation to quickly and amicably resolve its dispute with Diamond D, but wantonly or recklessly disregarded this duty.

{41} After receiving the letter suspending its remediation work, Diamond D repeatedly and urgently attempted to contact PNM officials to request a meeting to attempt resolution of the billing dispute. Without exception, the officials contacted refused to discuss the dispute with Diamond D, instead referring Diamond D to other PNM employees or promising to get back to Diamond D, but failing to do so.

{42} The evidence also showed that PNM employees were aware of the dispute resolution provision as a result of their experience managing PNM contracts. As mentioned above, this provision was part of the general contract provisions drafted by PNM and included with all construction contracts. In addition, PNM employees testified that they understood the potential harm to Diamond D caused by PNM's refusal to use its best efforts to attempt an amicable and quick resolution to the billing dispute. For example, they understood that PNM's failure to pay Diamond D's invoices during the pendency of the dispute would put Diamond D in "a bind." In addition, PNM employees understood that as long as the dispute continued, Diamond D would not be awarded other contracts with PNM and, in fact, they communicated with other departments to encourage those departments to deny Diamond D's bids. Finally, although PNM was able to quickly respond to the removal of Diamond D by assigning another company to finish the wet pit work, Diamond D was unable to recover due to its previous commitment of equipment to PNM and its inability to secure additional PNM contract work. Ultimately, Diamond D was forced out of business.

{43} Furthermore, PNM's allegation that the contractual provisions were ambiguous does not preclude an award of punitive damages. The ultimate question is whether PNM's interpretation of the contract was reasonable such that its actions in breaching the contract could not be said to be undertaken with a culpable state of mind. *See Kueffer v. Kueffer*, 110 N.M. 10, 13, 791 P.2d 461, 464 (1990). After reviewing the record, we conclude that PNM's interpretation of the contract during the time it refused to meet with Diamond D was unreasonable and was in wanton disregard of Diamond D's rights. *Cf. id.* (upholding denial of punitive damages when evidence failed to show that defendant's interpretation of ambiguous contract

was based on culpable mental state). The PNM executive responsible for the decision not to work with Diamond D, Toni Ristau, testified that she understood the contract to allow her to immediately and indefinitely suspend work under the contract by merely refusing to issue work authorizations. In addition, she testified that she understood the contract to give PNM the discretion to decide what an adequate number of pits to remediate would be. She described the scope of her discretion as follows: "[The contract] says that the contractor can't go ahead until we tell them to. We decide what's an adequate number of pits. It might be one pit, it might be zero pits, it might be 50 pits at any given point in time." Finally, she testified that she did not attempt to resolve the billing disputes with Diamond D because she understood the contract to require Diamond D to formally notify PNM of an alleged contract dispute before the dispute resolution clause was triggered. In support of this interpretation, she described the billing errors as "problems," not as disputes. Later, however, she testified that she refused to meet with Diamond D because, shortly after the billing dispute arose, Diamond D indicated its intention to hire a lawyer "to get you guys to talk to us."

{44} We conclude that substantial evidence supports the jury's determination that PNM acted with a culpable mental state when it breached its contract with Diamond D. PNM's interpretation of the contract was in wanton disregard of Diamond D's rights to PNM's best efforts at dispute resolution and to an adequate number of pits to remediate during the pendency of the termination. In addition, the evidence showed PNM was aware that its failure to meet with Diamond D to resolve the billing dispute would likely result in harm to Diamond D and not only failed to exercise care to avoid such harm, but took action to exacerbate that harm by urging other PNM departments to penalize Diamond D during the pendency of the dispute. For these reasons, we affirm the jury's award of punitive damages. *See Paiz*, 118 N.M. at 210–11, 880 P.2d at 307–08.

## C. Post Judgment Interest

{45} Section 56–8–4(A) provides:

Interest shall be allowed on judgments and decrees for the payment of money from entry and shall be calculated at the rate of eight and three-quarters percent per year, unless the judgment is rendered on a written instrument having a different rate of interest, in which case interest shall be computed at a rate no higher than specified in the instrument or the judgment is based on tortious conduct, bad faith, intentional or willful acts, in which case interest shall be computed at the rate of fifteen percent.

{46} Diamond D argues that we should interpret Section 56–8–4(A) broadly, as imposing the higher 15 percent interest rate on all judgments awarding punitive damages. In support of this conclusion, Diamond D asserts that the terms "tortious conduct, intentional, bad faith or willful acts" reveal a legislative intent to impose the penalty of the higher interest rate whenever a judgment is based on the kind of culpable mental state justifying an award of punitive damages. Diamond D argues that the terms used in Section 56–8–4(A) are broader and more inclusive than the terms justifying punitive damages. As such, according to Diamond D, "every type of conduct justifying punitive damages under New Mexico law is included within the scope of one or more of the terms listed" in Section 56–8–4(A).

{47} PNM counters that Section 56–8–4(A) should be interpreted narrowly, as allowing the 15 percent interest rate to be applied solely to judgments based on tortious conduct, bad faith, or a specific factual finding that a defendant acted intentionally or willfully. PNM argues that this conclusion is mandated by the rule of statutory construction that the legislature should be presumed to act with knowledge of common law definitions, *see Harger v. Structural Servs., Inc.*, 121 N.M. 657, 662–63, 916 P.2d 1324, 1329–30 (1996), particularly the specific definitions attached to different culpable mental states under New Mexico law. PNM concludes that the legislature intentionally omitted other culpable mental states from its list of

judgments warranting the higher interest rates.

### 1. Standard of Review

{48} Issues of statutory construction and interpretation are questions of law, which we review de novo. *State v. Shaulis–Powell*, 1999–NMCA–090, ¶ 17, 127 N.M. 667, 986 P.2d 463; *Bajart v. Univ. of N.M.*, 1999 NMCA 064, ¶ 7, 127 N.M. 311, 980 P.2d 94. Our primary goal in interpreting statutes is to give effect to the legislature's intent. *State v. Martinez*, 1998–NMSC–023, ¶ 8, 126 N.M. 39, 966 P.2d 747. When possible, we give effect to the clear and unambiguous language of a statute. *See Whitely v. N.M. State Pers. Bd.*, 115 N.M. 308, 311, 850 P.2d 1011, 1014 (1993); *State v. Adam M.*, 2000–NMCA–049, ¶ 5, 129 N.M. 146, 2 P.3d 883. If the statute is ambiguous, however, we must resort to principles of statutory construction. *Citation Bingo, Ltd. v. Otten*, 121 N.M. 205, 211, 910 P.2d 281, 287 (1995). "A statute is ambiguous if reasonably informed persons can understand the statute as having two or more meanings." *Bd. of Educ. v. State Dep't of Pub. Educ.*, 1999–NMCA–156, ¶ 18, 128 N.M. 398, 993 P.2d 112.

{49} Here Diamond D interprets Section 56–8–4(A) as describing a wide range of culpable mental states warranting the higher post-judgment interest rate, a range which includes wantonness or recklessness insofar as these mental states are functionally synonymous with wilfulness and intention. PNM, on the other hand, interprets the section as describing a limited range of causes of actions, namely those based in tort or bad faith or requiring a specific finding of intention or wilfulness. We conclude that both interpretations are reasonable given that the terms used by the legislature encompass both culpable mental states and causes of action. We conclude that Section 56–8–4(A) is ambiguous, and therefore we resort to principles of statutory construction to ascertain the legislature's intent. *See Teague–Strebeck Motors, Inc.*, 1999–NMCA–109, ¶ 64, 127 N.M. 603, 985 P.2d 1183 ("[O]ur task of interpreting Section 56–8–4(A) is made more difficult by the absence of any apparent rationale for having the rate of post-judgment interest depend on the nature of the cause of action.").

{50} We find three such principles to be helpful in our interpretation of Section 56–8–4(A). First, we consider the legislative purpose behind the statute in order to best effectuate the intent of the statute and accomplish its objectives. *Peterson v. Wells Fargo Armored Servs. Corp.*, 2000–NMCA–043, ¶ 14, 129 N.M. 158, 3 P.3d 135. Second, we use statutes concerning similar subject matter, relevant common law principles, and public policy to guide us in our interpretation. *See Investment Co. of the Southwest v. Reese*, 117 N.M. 655, 658, 875 P.2d 1086, 1089 (1994) (determining legislative intent of ambiguous statute from similar statutes, relevant common law principles, and policy considerations). Finally, we read the provisions of the statute "together with statutes pertaining to the same subject and seek to achieve a harmonious result." *State v. Lopez*, 2000–NMCA–001, ¶ 5, 128 N.M. 450, 993 P.2d 767; *see also Key v. Chrysler Motors Corp.*, 121 N.M. 764, 769, 918 P.2d 350, 355 (1996).

### 2. Discussion

{51} An award of post-judgment interest serves two purposes. First, post-judgment interest compensates a plaintiff for being deprived of compensation from the time of the judgment until payment of the judgment debt by the defendant. *See Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 835–36, 110 S.Ct. 1570, 108 L.Ed.2d 842 (1990). Second, post-judgment interest "serves a salutary housekeeping purpose ... by creating an incentive for unsuccessful defendants to avoid frivolous appeals and by minimizing the necessity for court-supervised execution upon judgments." *Bailey v. Chattem, Inc.*, 838 F.2d 149, 152 (6th Cir.1988); *see also Brinn v. Tidewater Transp. Dist. Comm'n*, 113 F.Supp.2d 935, 938 (E.D.Va. 2000).

{52} Prejudgment interest serves similar purposes. In New Mexico, prejudgment interest may be awarded under either NMSA 1978, § 56–8–3 (1983), or Section 56–8–4(B). Section 56–8–3 allows pre-

judgment interest as a matter of right in cases based on money due by contract, money received to the use of another and retained without the owner's consent, and money due on the settlement of matured accounts. The purpose of an award of prejudgment interest under Section 56–8–3 is to compensate a plaintiff for the lost opportunity to use the money owed between the time the plaintiff's claim accrued and the time of judgment. *Sunwest Bank v. Colucci*, 117 N.M. 373, 377, 872 P.2d 346, 350 (1994). Section 56–8–4(B), on the other hand, gives a trial court the discretion to award prejudgment interest "as a management tool or penalty to foster settlement and prevent delay in all types of litigation." *Sunwest Bank*, 117 N.M. at 378, 872 P.2d at 351. In essence, the threat of an award of prejudgment interest under Section 56–8–4(B) ensures that the compensation due to a plaintiff is not unduly delayed by a defendant's dilatory practices. *Weidler v. Big J Enters., Inc.*, 1998–NMCA–021, ¶ 52, 124 N.M. 591, 953 P.2d 1089.

{53} Based on our comparison of the statutory schemes for awarding pre- and post-judgment interest, we conclude that the legislature intended to leave the appropriate rate of post-judgment interest to the discretion of the trial court in cases where a judgment is not based on tortious conduct, bad faith, or a specific finding of intention or willfulness, but where the evidence shows that a defendant's liability to a plaintiff is based on intentional or willful actions. *See Bustos v. Bustos*, 2000–NMCA–040, ¶ 22, 128 N.M. 842, 999 P.2d 1074 (remanding for a determination of whether the 15 percent interest should apply to an award of child support arrearages where evidence indicated father willfully withheld support).

{54} Under Section 56–8–4(A), a trial court must impose post-judgment interest at the rate specified by the statute. *See Sunwest Bank*, 117 N.M. at 379, 872 P.2d at 352. The statute does not give a trial court the discretion to deny post-judgment interest. *Id.; see also Bustos*, 2000–NMCA–040, ¶¶ 20–21, 128 N.M. 842, 999 P.2d 1074. *But see Gonzales v. N.M. Dep't of Health*, 2000–NMSC–029, ¶ 38, 129 N.M. 586, 11 P.3d 550

(relying on cases involving interest as proof of damages or decided before Section 56–8–4(A) became mandatory to determine that the award of post-judgment interest was discretionary). All judgments for the payment of money must be assessed a minimum of eight and three-quarters percent interest unless a lower interest rate is specified in a written instrument on which the judgment is based. Section 56–8–4(A). This basic interest rate ensures that the first purpose of the statute is met, namely that a plaintiff is recompensed for being deprived of compensation from the time of the judgment until the time the defendant pays the judgment debt. In addition, the basic interest rate fulfills the second purpose of the statute in most cases, by discouraging the defendant from unnecessarily prolonging the case by filing frivolous appeals or by forcing the plaintiff to seek a court-supervised execution on the judgment.

{55} When a judgment is based on tortious conduct, bad faith, or a finding that the defendant acted intentionally or willfully, a court must award interest at the higher rate of 15 percent. *Id.; see also Teague–Strebeck Motors, Inc.*, 1999–NMCA–109, ¶ 61, 127 N.M. 603, 985 P.2d 1183. This increased penalty is warranted when the facts of a particular case show that the defendant has acted culpably in the past and therefore may be in need of additional encouragement to timely pay the judgment debt owed to the plaintiff.

{56} The purposes of both pre-judgment and post-judgment interest differ from the purposes of punitive damages. Punitive damages are awarded to punish and deter wrongful conduct committed with a culpable state of mind. *Paiz*, 118 N.M. at 210–11, 880 P.2d at 307–08. While we agree with Diamond D that the award of punitive damages requires a greater degree of culpability than the award of compensatory damages in most tort cases, we disagree that this compels the conclusion that the legislature had punitive damages in mind when it amended Section 56–8–4(A) to provide the higher rate of interest. As noted by PNM, had the legislature intended such a broad reading of the post-judgment interest stat-

ute, it would have explicitly included judgments awarding punitive damages in its list of judgments warranting the higher rate. *See In re Petition of PNM Gas Servs.,* 2000–NMSC–012, ¶ 73, 129 N.M. 1, 1 P.3d 383 (stating that appellate courts assume that the legislature is aware of the law in effect at the time a statute is enacted).

{57} We recognize that the " 'interpretation of well-defined words and phrases in the common law carries over to statutes dealing with the same or similar subject matter.' " *Harger,* 121 N.M. at 662–63, 916 P.2d at 1329–30 (quoting 2B Norman J. Singer, Sutherland Statutory Construction § 50.03, at 103 (5th ed.1992)). In this case, although the terms "willful," "wanton," and "bad faith," for example, are frequently used interchangeably in our case law, we have repeatedly maintained the distinction between them. *See Romero v. Mervyn's,* 109 N.M. 249, 256, 784 P.2d 992, 999 (1989) (recognizing that the nuances distinguishing terms describing culpable mental states justify retaining the various terms to guide a jury's discretion in awarding punitive damages). We will not conclude that the legislature intended to impose the higher interest rate in all cases in which a defendant acts with a culpable mental state. Nonetheless, we also will not conclude that the legislature intended to limit the higher rate to those judgments that include the magic words, "intentional" or "willful." Instead, we conclude that the legislature intended the phrase "intentional or willful acts," when read in conjunction with "tortious conduct" and "bad faith," to provide a guide for a trial court to determine which post-judgment interest rate should apply when the facts show that a defendant acted culpably.

{58} "Tortious conduct" has been defined as an act or omission that subjects an individual to liability under the principles of tort law. *See* Restatement (Second) of Torts § 6 (1965). In tort law, conduct may be actionable whether the actor intends harm or not. *See id.* cmt. a. Nonetheless, the most common of the tort causes of action require a finding that a defendant acted negligently, recklessly, or intentionally. *See id.* "Bad faith" has been defined both as a cause of

action, *see generally* UJI 13–1701 to –1718 NMRA 2001 (instructions for bad faith claim against an insurer), and as a mental state, *see* UJI 13–1827 NMRA 2001 (listing bad faith as grounds for punitive damages). In the context of insurance, we have defined "bad faith" as "reckless disregard, in which the insurer *utterly* fail[s] to exercise care for the interests of the insured in denying or delaying payment on an insurance policy." *Jackson Nat'l Life Ins. Co. v. Receconi,* 113 N.M. 403, 419, 827 P.2d 118, 134 (1992) (internal citations and quotation marks omitted); *see also* NMSA 1978, § 52–1–54(I) (1993) (defining bad faith as conduct amounting to "fraud, malice, oppression or willful, wanton or reckless disregard" of a plaintiff's rights).

{59} Willful conduct has been defined as "the intentional doing of an act with knowledge that harm may result." UJI 13–1827. "Reckless conduct," by contrast, is defined as "the intentional doing of an act with utter indifference to the consequences." *Id.* Finally, "wanton conduct" is defined as "the doing of an act with utter indifference to or conscious disregard for a person's [rights] [safety]." *Id.* Two characteristics distinguish these three terms: (1) the intention of the actor and (2) the degree of knowledge of the possible consequences of an action possessed by the actor at the time of the act. If a defendant is found to have acted willfully, clearly the higher post-judgment interest rate applies. *See* § 56–8–4(A); *Teague–Strebeck Motors, Inc.,* 1999–NMCA–109, ¶ 61, 127 N.M. 603, 985 P.2d 1183. If, on the other hand, the evidence shows only wantonness, the basic interest rate must apply because a finding of wantonness does not include a finding of either willfulness or intention. When the evidence shows recklessness, however, it is for the trial court to determine whether the defendant's conduct is more like willfulness or more like wantonness and to award the appropriate interest rate based on that finding.

{60} In the case at bar, the jury was instructed that to award punitive damages, it must first find that PNM acted either wantonly or recklessly. As such, it was up to the

trial court to decide whether the evidence showed that PNM had acted with the intent necessary to support an award of the 15 percent interest rate. *See Bustos,* 2000–NMCA–040, ¶ 22, 128 N.M. 842, 999 P.2d 1074. After reviewing the record, we conclude that the trial court did not abuse its discretion in denying Diamond D's request for the higher rate. *See Sims v. Sims,* 1996–NMSC–078, ¶ 65, 122 N.M. 618, 930 P.2d 153 ("An abuse of discretion occurs when a ruling is clearly contrary to the logical conclusions demanded by the facts and circumstances of the case.").

{61} Although the evidence showed that PNM acted with utter indifference to Diamond D's rights under the contract and understood that its failure to respond to Diamond D's attempts to resolve the billing dispute could harm Diamond D, Diamond D has not directed us to evidence sufficient to support a finding that PNM intended to breach the contract and thereby harm Diamond D. In addition, we note that the punitive damages award was high in this case and conclude that the court may have weighed the amount of punitive damages in light of the degree of PNM's culpability in deciding to award the lower rate. This balancing of the equities is an appropriate exercise of discretion. *Cf. Gonzales v. Surgidev Corp.,* 120 N.M. 133, 150, 899 P.2d 576, 593 (1995) (stating that trial court should take into account all equitable considerations when exercising discretion to award prejudgment interest under Section 56–8–4(B)); *State ex rel. Bob Davis Masonry, Inc. v. Safeco Ins. Co.,* 118 N.M. 558, 561, 883 P.2d 144, 147 (1994) (stating that similar considerations must be made when awarding prejudgment interest under Section 56–8–3).

{62} In conclusion, if a plaintiff wants to insure that a judgment is assessed the higher 15 percent interest rate in a case not based in tort or bad faith, the plaintiff must specifically request that the factfinder make a finding of intention or willfulness. If such a finding is not made, and the evidence indicates that the defendant acted with a culpable mental state approximating intention or willfulness, the award of the higher interest rate will be left to the sound discretion of the trial court.

## III. CONCLUSION

{63} For the reasons discussed herein, we affirm the judgment and the award of compensatory and punitive damages. Likewise, we affirm the trial court's imposition of post-judgment interest at the rate of eight and three-quarters percent.

{64} **IT IS SO ORDERED.**

WE CONCUR: JAMES J. WECHSLER, Judge and JONATHAN B. SUTIN, Judge.